In re Truett R. BEATTIE and T. Gerald Beattie, d/b/a Milk Valley Dairy, Debtor.

UNITED STATES of America, Plaintiff,

v.

Truett R. BEATTIE and T. Gerald Beattie, d/b/a Milk Valley Dairy, Defendant.

Truett R. BEATTIE and T. Gerald Beattie, d/b/a Milk Valley Dairy, Plaintiff,

v.

FARMERS HOME ADMINISTRATION, Defendant.

Bankruptcy No. C–B–82–212.
Adv. Nos. 82–0571, 82–0417.

United States Bankruptcy Court,
W.D. North Carolina,
Charlotte Division.

May 9, 1983.

William R. King, Marilyn Bright, Lipshutz, Frankel, Greenblatt, King & Cohn, Atlanta, Ga., Geoffrey A. Planer, Gastonia, N.C., for debtors.

Lawrence Lee, U.S. Dept. of Agriculture, Atlanta, Ga., for the U.S.

MARVIN R. WOOTEN, Bankruptcy Judge.

This Chapter 11 bankruptcy proceeding is presently before the Court upon complaint of the Farmers Home Administration (FmHA) for relief from the automatic stay of 11 U.S.C. § 362(a), and Debtor's Answer and Counterclaims thereto involving *inter alia* lien avoidance, preference, and breach of contract claims against FmHA (Adversary No. 82–0571). Concurrently pending for determination are FmHA's Motion to Dismiss pursuant to 11 U.S.C. § 1112(b)(1), (b)(2) and (b)(3); Debtor's Complaint for Turnover (Adversary No. 82–0417); and remaining issues raised in the Debtor's Application for Use of Cash Collateral initially considered by this Court on September 24, 1982.

By agreement of the parties hereto, with the approval of this Court, and in the interests of judicial economy arising from the common issues involved, all of the above pending matters were consolidated for trial and heard by this Court in Charlotte, North Carolina on April 11 and 12, 1983. Based upon the evidence presented at that trial, evidence presented at the hearing on Debtor's Application for Use of Cash Collateral held on September 21, 1982, the pleadings and briefs of the parties heretofore filed, review and consideration of the statutes and regulations applicable to FmHA, and after hearing all arguments of counsel, this Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Creditor FmHA is an agency of the United States Department of Agriculture. It is the lender of last resort for farm borrowers, 7 U.S.C. § 1922(4).

2. The Debtor in this Chapter 11 case is Truett R. Beattie and T. Gerald Beattie, d/b/a Milk Valley Dairy (hereinafter referred to as "Debtor" or "Beatties"). The Debtor is operating as a debtor-in-possession, and as such under 11 U.S.C. § 1107 has the authority to pursue all claims and maintain all defenses available to both the Beatties and as Trustee for the benefit of the estate.

3. This Court has jurisdiction to hear this case pursuant to Section 1471 of Title 28 of the United States Code and the model rule offered by the Judicial Conference of the United States as adopted by the United States District Court for the Western District of North Carolina.

4. Truett and Gerald Beattie are borrowers from the FmHA pursuant to authority granted that Agency by the Consolidated Farm and Rural Development Act of 1961, as amended, 7 U.S.C. § 1921 *et seq.,* and the regulations implementing that authority, 7 C.F.R. Parts 1800 and 1900.

5. The Beatties are engaged in a dairy farming operation in Bessemer City, North Carolina, and have been continuously in the dairy business for at least 30 years. They. are engaged in business under the name Milk Valley Dairy.

6. The Beatties' dairy operations are located upon a 58 + acre tract of hilly land, unsuitable for crop farming, owned by Truett Beattie. On that land are constructed various buildings and facilities required for the dairy operation, as well as a five-room frame house in which Truett Beattie and his family reside.

7. The Beatties also own cows, farm equipment, feed and silage necessary for the operation of a dairy business.

8. All of the real estate and fixtures thereupon have been given as security by Debtor in several deeds of trust to FmHA as security for said Debtor's obligation to that agency; those deeds are dated August 24, 1972, August 28, 1978, May 13, 1980, and July 29, 1981, and were recorded by FmHA in the Office of the Register of Deeds of Gaston County, North Carolina.

9. The Federal Land Bank has a first lien upon the foregoing real estate and fixtures, securing an obligation which as of April 12, 1983 totalled $34,526.31, principal and interest.

10. Prior to crop year 1982, the Beatties rented crop lands in the vicinity of their dairy farm on which they planted and harvested crops to provide hay and silage for their dairy cows.

11. For at least the past 10 years, the Beatties have borrowed funds from FmHA to finance their dairy and farming operations. The Beatties have looked to and utilized FmHA as their primary source of operating credit for this period of time, and FmHA financing has been used for planting of crops, purchase of machinery necessary for their feed growing and milking operations, purchase of livestock, repair and improvement of the real estate, and operating expenses. Throughout these transactions, the FmHA has treated the Beatties as individual borrowers for the purpose of applying loan limitations and other regulations concerning the administration of its authority under the Consolidated Farm and Rural Development Act.

12. The Beatties' credit transactions with FmHA have been collateralized by the granting of security interests in their equipment, livestock, crops, farm products, milk, milk base, and the proceeds thereof, as well as in the real estate.

13. Those security interests were perfected by FmHA by the filing of financing statements in Gaston County, North Carolina pursuant to North Carolina General Statutes Sec. 25–9–302.

14. On February 17, 1983, the FmHA filed a Proof of Claim in the bankruptcy concerning its relationship with Truett R. Beattie and Helen R. Beattie, which proof recited a total indebtedness of $534,410.68. The proof further set out twelve promissory notes, three security agreements, two financing statements, two continuation statements, and an assignment of proceeds as security for the said indebtedness.

15. On February 17, 1983, the FmHA filed a Proof of Claim in the bankruptcy concerning its relationship with T. Gerald Beattie and Marie H. Beattie, which proof recited a total indebtedness of $511,372.94. The proof further set out eleven promissory notes, three security agreements, two financing statements, two continuation statements, and an assignment of proceeds as security for the said indebtedness.

16. All of the government's security agreements cover crops growing on farms more fully described therein, as well as farm equipment and livestock. In addition to the farm equipment listed, the security agreements contain the following language:

Item 2. All farm and other equipment (except small tools and small equipment unless described below), in inventory now owned or hereafter acquired by the debtor, together with all replacements, substitutions, additions, and accessions thereto, including but not limited to the following.

Thereafter the documents contain various items of farm equipment. The security agreements also contain the following language regarding livestock:

Item 3. All livestock (except livestock and poultry kept primarily for subsistent purposes), fish, bees, birds, fur bearing animals, other animals produced or used for commercial purposes, other farm products and supplies now owned or hereafter acquired by debtor, together with all increases, replacements, substitutions, and additions thereto, including but not limited to the following.

Thereafter various cows, heifers and bulls are listed in the security agreements.

Each of the financing statements filed by the government to perfect the aforesaid security agreements contains the following language:

1. This financing statement covers the following types or items of collateral including *proceeds* and *products* thereof:

(a) Crops, livestock, supplies, other farm products and farm or other equipment.

(b) All milk base.

17. As a means of accommodation some of the parties executed and all operated in accord with an "Assignment of Proceeds from the Sale of Dairy Products and Release of Security Interest" (Government Ex. 6) (form FHA 441–25) (hereinafter "milk assignments"), which released a portion of the Government's security from milk products in order that the purchaser of milk, on a transactional basis, would receive clear title thereto, and the debtor be permitted thereby the use of a portion of the funds, with the remainder to be remitted to the secured party, all as agreed to by the debtor (seller), the purchaser, and FmHA (secured party).

18. In the Complaint for Turnover, the Debtor's Application for Use of Cash Collateral, and Debtor's original Answer and Counterclaim and unopposed amendment thereto, Debtor has raised issues concerning the validity and perfection of FmHA's security interests.

19. The FmHA typically participates in "milk assignment" from borrowers operating dairy farms as the sole or major source of repayment for FmHA loans. 7 C.F.R. Secs. 1951.8, 1962.6. The FmHA has had a series of "milk assignments" with this Debtor since 1972, culminating in the "assignments" entered at trial as Government Exhibits 7 and 6: "milk assignments" dated March 29, 1981 and September 25, 1981 in the amounts of $12,000 per month and $16,000 per month respectively. These "assignments" are on pre-printed forms prepared by FmHA.

20. A "milk assignment" is the contractual assignment of all or a portion of the proceeds received from the purchase of an FmHA borrower's milk (in which FmHA holds a security interest) by another party, in this case Dairymen, Inc. In order to implement the "milk assignment" so that payment is received by FmHA, and/or the borrower, through the purchasing entity, the assignment must be accepted by the purchaser. (Government Exhibit 7.)

21. An examination of Government Exhibits 6 and 7 shows that each subsequent "milk assignment" supersedes any previous "milk assignment." Both documents contain a portion evidencing the assignment's acceptance by the purchaser and the terms of such acceptance.

22. Government Exhibit 6 contains a portion labeled "Release of Security Interest" for execution by FmHA. That portion contains the following language:

> In consideration of the acceptance of this assignment by the above named Purchaser the FHA hereby releases any lien or security interest it has or may have in *dairy products sold by Borrower to, by or through Purchaser.* (Emphasis added.)

That portion of Government Exhibit 6 entitled "Release of Security Interest" does not appear to be executed by FmHA or one of its agents. Nevertheless, it is undisputed in the record of this case that Dairymen, Inc. has accepted this assignment, and in consequence thereof has paid to FmHA each month a portion of the proceeds of sale of Debtor's milk. Thos funds have been credited to Debtor's loans with FmHA during 1981 and 1982 in the amounts shown in Government Exhibit 11. Furthermore, County Supervisors are expressly authorized to release normal income security when the property has been sold or exchanged for its present market value and the proceeds are used, *inter alia,* to pay debts owed to FmHA, 7 C.F.R. Sec. 1962.17(b)(1) and, "[R]eleases need not be executed unless requested by a borrower or by an interested third party." 7 C.F.R. Sec. 1962.17(i).

23. Although the FmHA has taken a perfected security interest in milk, its proceeds, and the milk base, it is clear from the evidence before this Court that in consequence of the "milk assignment" the FmHA has waived its security interest in the milk product only, to allow Debtor's milk to be sold free and clear of lien, on a sale by sale or transactional basis.

24. Debtor's income is almost wholly derived from the sale of its milk through Dairymen, Inc. The "milk assignments" share to the Debtor during 1981 and 1982 constituted a significant portion of the Debtor's income and accounts with Dairymen, Inc.

25. The FmHA has received payments in consequence of the "milk assignment," entered as Government Exhibit 6, from the filing of Debtor's Chapter 11 bankruptcy petition on March 12, 1982 through August, 1982. As shown in Government Exhibit 11, the amount so received by FmHA is $94,824.67.

26. By order of this Court dated September 24, 1982, payments to FmHA under this "milk assignment" ceased, and the Debtor has received the benefit of all of the amount of proceeds from the sale of its milk, subject to the restrictions upon the use of those funds, from September through the date of this order. That order characterized those "milk assignment" monies as cash collateral and granted the FmHA a super priority as to their repayment; however, the issues of lien avoidance and preference were specifically left undetermined at that time.

27. In the fall of 1979, the Beatties approached Carlton Sessoms, the FmHA County Supervisor, to inquire about the possibility of obtaining financing to expand their dairy facilities so as to accommodate an increase of approximately 250 to 300 cows. He advised them to seek the advice of the County Agent and of a dairy specialist and come back with their recommendations.

28. The Beatties also discussed the proposed expansion with the County Agent, who concurred in concept with the idea. The Beatties consulted a dairy specialist from N.C. State University who recommended certain types of facilities and equipment which could be incorporated into a new dairy barn, or which could be added by expansion of the existing dairy barn.

29. The Beatties met further with Sessoms, the FmHA County Supervisor, who tentatively approved the expansion plans and tentatively agreed to authorize loans to fund those plans. All agreed that the first priority was to increase their feed-growing operation so as to have sufficient feed for the extra cows. The second priority was to expand their existing barn, increase their feed storage facilities and build a new shop and machine shed.

30. The Beatties, in furtherance of their expansion plans and with the knowledge of Carlton Sessoms, the FmHA County Supervisor, almost doubled the acreage they rented to grow their feed crops and applied for and were granted loans, the funds from which were used to pay for fertilizer, seed, and other expenses associated with the planting and harvesting of the crops planned to be used by the Beatties to feed the increased dairy herd.

31. The Beatties, with the knowledge of Carlton Sessoms, the FmHA County Supervisor, constructed improvements in their dairy facilities, including doubling of the capacity of their milking parlor, rewiring of their barn, installation of two new grain bins, increasing the size of two existing silos, and constructing a new silo, new shop and machine shed.

32. The Beatties, with the knowledge of the FmHA County Supervisor, purchased additional machinery to plant and harvest the additional crops and which was otherwise needed for proper operation of the planned expanded dairy herd and facilities.

33. Truett Beattie applied to Carlton Sessoms, the FmHA County Supervisor, for and was granted loans during 1980 in the principal sum of $105,000, the proceeds of which, with the consent, approval and authorization of the FmHA County Supervisor, were applied toward payment of expenses incurred in expanding the existing buildings and improvements on the real estate and in the construction of the new buildings and improvements on said real estate.

34. Gerald Beattie applied to Carlton Sessoms, the FmHA County Supervisor, for and was granted loans during 1980 in the principal sum of $173,000, the proceeds of which, with the consent, approval and authorization of the FmHA County Supervisor, were applied toward the expenses incurred in the planned expansion of the dairy herd, such as the planting and harvesting of crops for feed and the purchase of additional machinery.

35. During the crop year of 1980, as a result of a drought, the Beatties suffered a crop loss estimated by them to be $185,000. As a result of the 1980 drought, a disaster declaration was issued in 1981, which included Gaston County.

36. Pursuant to the terms of the loans made to Truett and Gerald Beattie prior to and including the 1980 loans, their combined payment obligation due on January 1, 1981 was $221,695.08. As of January 1, 1981, the Beatties were delinquent in their loan repayment in an amount the Court is unable to determine from the evidence.

37. Gerald Beattie applied to Carlton Sessoms, the FmHA County Supervisor, for and was granted loans during 1981 in the principal sum of $162,000, the proceeds of which, with the consent, approval and authorization of the FmHA County Supervisor, were applied toward expenses incurred in the planned expansion of the dairy, such as planting and harvesting crops for feed and payments upon the farm equipment acquired for the expanded planting and harvesting operations.

38. Truett Beattie applied to Carlton Sessoms, the FmHA County Supervisor, for and was granted loans during 1981 in the principal sum of $160,000, the proceeds of which, with the consent, approval and authorization of the FmHA County Supervisor, were applied toward expenses incurred in the planned expansion of the dairy, such as the repairs and improvements to existing buildings and construction of new buildings on the real estate.

39. Pursuant to the terms of the loan documents executed by the Beatties, including the 1981 loans, their combined current payment obligation due to FmHA as of January 1, 1982 was $149,300.

40. Prior to making the 1981 loans to the Beatties, Carlton Sessoms, the FmHA County Supervisor, anticipated that the Beatties would have insufficient income to meet the debt service unless the expanded dairy herd plans were completed and, if, as of January 1, 1982, they were unable to make their payments as scheduled in the notes, he planned to consider the exercise of authority granted him under the regulations to reschedule, reamortize, or defer the payments due by the Beatties so as to reflect an amount which was within their ability to pay.

41. In August of 1981, Carlton Sessoms, who had been the County Supervisor for FmHA in Gaston County, North Carolina since 1978, had his loan approval authority terminated by his superiors, but he continued to hold the position as County Supervisor until December, 1981. The Beatties were not advised that after August, Sessoms no longer had the full authorities of the County Supervisor.

42. Prior to removal of his loan approval authority, Sessoms was of the opinion that the Beatties were capable of managing their to-be-expanded operation; that they were making repayments in accordance with their abilities to repay; that they were properly accounting for security; and that if the remainder of the expansion was funded and completed the payments could be rescheduled in a manner that would be within their ability to repay and that their full indebtedness would be repaid.

43. In September of 1981, the Beatties met with Sessoms and made application for emergency disaster loans, pursuant to the disaster declaration that had been declared as a result of the 1980 drought in Gaston County. Sessoms accepted those applications and began processing them. The Beatties also discussed the need for the loan to purchase the additional cows and the need to utilize some of their existing loan money to complete payment of certain expenses that had been incurred in the expansion of their facilities, and to complete other planned expansion activities so they could begin their increased operations. During those meetings and discussions, Sessoms advised the Beatties that it would be necessary to increase the "milk assignment" from $12,000 to $16,000 per month, effective October 15, 1981, so as to reflect a better payment record.

44. In December, 1981, Carlton Sessoms was relieved of all authority as County Su-

pervisor, and Mike Huskey replaced him. Huskey initially was in Gaston County on a part-time basis until the latter part of December, 1981, when he became full-time.

45. After Sessoms was replaced as County Supervisor by Huskey, the Beatties' attempts to obtain the additional funds to carry out their expansion plans were met by refusals and statements that they were hopelessly delinquent. Although Mr. Huskey testified he was willing to consider their expansion plans, it was clear from the evidence that he considered his authority was limited to reviewing anew their operations, so as to make an independent determination as to whether they could cure their delinquencies with their then-existing income. He made no inquiry of Sessoms' dealings with the Beatties, and concluded that the Beatties should liquidate.

46. The Court finds from the evidence that the FmHA in 1981 as a matter of national policy decided to tighten its debt servicing and collection efforts, and had set for the North Carolina State Director's office a goal of approximately 1,000 of the 3,600 delinquent FmHA borrowers in the State of North Carolina to be removed from a delinquent status during the year 1981. The County Supervisors advised all FmHA borrowers that the FmHA programs were primarily designed for family-sized farms and that they were to more stringently supervise the loan servicing and delinquencies of farms which were larger than family size. In a letter of July, 1981, sent in a mass mailing to all Gaston County borrowers, that policy was communicated to all borrowers. (Defendant's Exhibit 5.)

47. Although Mr. Huskey testified that he was willing to continue to work with the Beatties but could not do so because of their inability to furnish him accurate records, etc., the evidence shows that as of January 11, 1982, only a few weeks after Mr. Huskey had been on the job full time, he executed a problem case report recommending that the State Director accelerate the loans of Truett Beattie and initiate foreclosure upon the real estate securing those loans. That recommendation was based upon his conclusions, using "actual" 1981 figures, that the operation was not profitable; debts greatly exceeded ability to repay; lack of management ability to succeed with that kind of operation; no reasonable chance to accomplish loan objectives; rescheduling of loans could not be justified and would not benefit borrower; no buyer or eligible transferee available; delay will impair government security position; and deficiency judgment would not be collectable.

48. Truett Beattie testified that upon his first substantive meeting with Huskey, he was emphatically informed that Huskey had been sent to clean up the problems created by Sessoms, and he was going to start with the Beatties.

49. The Court finds from the totality of the evidence that after Sessoms was removed as County Supervisor, no real consideration was given to the possibility of continuing with the Beatties on the basis of the expansion plans.

50. The evidence further showed that early in 1982, a national directive from FmHA was issued prohibiting the use of funds to finance new dairy enterprises or to expand existing dairy enterprises. Although the record shows that policy was not formally communicated to the state offices until May of 1982, the philosophy of that policy was clearly apparent in the manner in which the FmHA dealt with the Beatties, and no doubt affected the willingness of the FmHA to continue with the Beatties.

51. In February, 1982, the Beatties were advised by Huskey that as far as he was concerned, the liquidation process had already started and that they should voluntarily liquidate. (Defendant's Exhibit 6.) On March 12, 1982, Truett and Gerald Beattie, d/b/a Milk Valley Dairy, filed this Chapter 11 proceeding.

52. The loan approval authority of a County Supervisor is dependent upon the type of loan involved, and is limited to an outstanding principal balance at loan closing not to exceed for the following types of loans:

OL    $100,000 7 C.F.R. 1941.17

FO The lesser of $200,000 or the fair market value of the real estate securing same. 7 C.F.R. 1943.17

EE $400,000 7 C.F.R. 1945.117(b)

EE, FO, OL, SW & RL combined $650,000 7 C.F.R. 1943.29(b) (Note EM Loans are not included in the $650,000 limitations.)

EM $500,000 Combined limit for annual production and major adjustment loans during FYs 81 and 82. 7 C.F.R. 1945.-166(d)

53. The evidence does not reflect the outstanding principal balance of each category of loan which had been made to the Beatties by September, 1981, when they requested additional funding from Sessoms and made application for their EM loans, but Defendant's Exhibit 13 shows the categories of each loan and the face amounts thereof. The face amounts and outstanding principal balances as of April, 1982, are reflected on Government Exhibits 4 and 5. From those three exhibits the Court finds that Truett Beattie executed notes in the original principal amounts of the following categories: EE—$265,000; FO—$61,500; OL—$95,000; and EM—$151,500; for a total of $421,500.

From those three exhibits the Court finds that Gerald Beattie executed notes in the original principal amounts of the following categories: EE—$292,500; OL—$106,450; and EM—$155,630; for a total of $398,450.

The records of the FmHA indicate that Truett R. Beattie and T. Gerald Beattie are currently indebted to the agency in the principal amount of $901,994.33, with interest amounting to $157,760.00, as of April 8, 1983.

54. All notes executed by the Beatties contain the following language:

This Note is given as evidence of a loan to Borrower made or insured by the Government pursuant to the Consolidated Farm and Rural Development Act, or the Emergency Credit Adjustment Act of 1978 and for the type of loan as indicated in the "Kind of Loan" block above. This Note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof.

55. The security agreements executed by the Beatties were on form FmHA 440–4 (Rev. 6–10–76) which contains the following provision:

IV E. This Agreement is subject to the present regulations of the Secured Party and to its future regulations not inconsistent with the express provisions hereof.

IV J. Secured Party will make or insure future loans or advances to Debtor to enable him to raise or harvest farm crops or raise livestock or other animals, provided funds are available and the Debtor meets all then current requirements imposed by regulations of the Secured Party.

56. The deeds of trust executed by Truett Beattie contain the following provisions:

(24) This instrument shall be subject to the present regulations of the Farmers Home Administration, and to its future regulations not inconsistent with the express provisions hereof.

(14) The government may (a) extend or defer the maturity of, and renew and reschedule the payments on, the debt evidenced by the Note or any indebtedness to the Government secured by this instrument, (b) release any party who is liable under the note or for the debt from liability to the government, (c) release portions of the property and subordinate its lien, and (d) waive any other of its rights under this instrument. Any and all this can and will be done without affecting the lien or the priority of this instrument unless the Government says otherwise in writing. HOWEVER, any forebearance by the Government—whether once or often—in exercising any right or remedy under this instrument, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

(17) Default hereunder shall constitute default under any other real estate, or

under any personal property or other, security instrument held or insured by the Government and executed or assumed by the Borrower, and default under any such other security instrument shall constitute default hereunder.

57. Each of the Government's security agreements grants a security interest in all crops, annual and perennial, and other plant products now planted, growing or grown or which are hereafter planted or otherwise become growing crops on the listing of the farms rented by the Beatties. Additionally, a security interest is granted on all farm and other equipment (except small tools and small equipment unless described below), and inventory now owned or hereafter acquired by the Debtor, together with all replacements, additions and accessions thereto and includes but is not limited to a list of equipment contained in the agreement. The security agreement further grants a security interest in all livestock (except livestock and poultry kept primarily for subsistence purposes), fish, bees, birds, fur bearing animals, other animals produced or used for commercial purposes, other farm products and supplies now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto, including but not limited to a listing of cows, heifers and calves. (See Finding No. 16 above.)

58. The deed of trust conveys to the Government as trustee with a general warranty the real estate described therein together with:

all rights, interests, easements, hereditments, appurtenances (including but not limited to bulk tobacco curing barns) thereunto belonging, the rents, issues and profits thereof and revenues and incomes therefrom, all improvements and personal property now or later attached thereto or reasonably necessary to the use thereof, including but not limited to, ranges, refrigerators, clothes washers, clothes dryers, or carpeting purchased or financed in whole or in part with loan funds, all water, water rights, and water stock pertaining thereto, and all pay-

ments at any time owing to Borrowers by virtue of any sale, lease, transfer, conveyance or condemnation or any part thereof or interest therein—all of which are ... called "the property."

59. The funds from the loans made to the Beatties in 1980 and 1981 were deposited in supervised bank accounts from which they could be drawn only upon the co-signature of the County Supervisor or other representative of the FmHA. Thus, before funds may be withdrawn, there must be agreement between the County Supervisor and the Borrower as to the use of those funds. Carlton Sessoms testified that in his opinion he had the authority to veto requested expenditures by the Borrower. The Court finds that he in fact required the Borrower to pay certain trade creditors rather than other creditors who had performed the work in constructing improvements on the property.

60. Carlton Sessoms, the FmHA County Supervisor, was authorized to approve, consolidate, reschedule and defer loans, when in his opinion such action would assist in the orderly collection of the loan. Furthermore, the regulation granting that authority, 7 C.F.R. 1951.33(b), requires that

... the County Supervisor should take such action, provided (1) such action is not used in lieu of or to delay liquidation; (2) such action is not taken to only remove the delinquency; (3) such action is not taken to circumvent FmHA's graduation requirements; (4) the Borrower's account is not being serviced by OGC or the U.S. Attorney, and there are no plans to have the account serviced by either of these offices in the near future; (5) County Supervisor determines that the Borrower is making satisfactory progress or will make satisfactory progress with revised payment terms; and (6) the Borrower is cooperating in servicing the account and is maintaining the security.

61. The Court finds from the evidence before it that the Beatties' inability to meet their scheduled payments resulted in part from the fact that they had suffered a crop loss in the drought of 1980 and that the

funds they contemplated to be furnished to them to complete their expansion plans were not forthcoming. The Court further finds from the evidence that in making his loan servicing decisions and his loan approval decisions, Sessoms was aware of and considered those circumstances.

62. The payments made upon the Beatties' loans with FmHA are recounted in Government Exhibit 11. Compared with Debtor Exhibit 13, it shows that all payments were credited to antecedent debts, that is, debts for which the Beatties already had liability at the time the payments were made. The dates of the payments pre-petition and post-petition are also shown in Government Exhibit 11, and this Court finds the payments to FmHA were made on or about those dates.

63. The total amount of payments made to FmHA by or on behalf of the Debtor, segregated by time periods, is as follows:

(a) Within 1 year pre-petition to 90 days pre-petition: $107,887.43;

(b) Within 90 days pre-petition: $40,864.38;

(c) Within post-petition period: $94,825.67.

64. This Court finds as a matter of fact from the evidence that the Debtor was insolvent, under the definition of 11 U.S.C. § 101(26) during the entire period one year pre-petition and certainly post-petition.

65. Despite a wide difference in opinions as to the appraised value of the property in this matter, the Court finds that the Plaintiff is undersecured.

66. The Farm & Home Plans submitted as Exhibits 1, 2, 3 and 9 to the deposition of Carlton Sessoms, coupled with Debtor Exhibits 1 and 13, demonstrate Debtor's insolvency and further demonstrate the actual and constructive knowledge of FmHA of Debtor's insolvency.

67. The Debtor's milk base was reduced from 5,333 pounds for 1982 to 3,488 pounds for 1983, and the milk base currently may be sold for from $3 to $5 per pound. This reduction occurred even though the debtor had use of the milk proceeds, by order of this Court. Such milk base reduction limits proceeds for sales above the new base to lower or "surplus" prices.

68. There is a wide range of opinion as to the value of real estate and chattel security covered by the liens of the FmHA. The debtors produced appraisers who testified the real property was worth between $60,000 and $72,700. Mr. Charles M. Huskey, County Supervisor for the FmHA in Gaston County, North Carolina, testified that he had appraised the real property and, in his opinion, it was worth $230,000 with improvements. The debtors further introduced evidence indicating the fair market value of the dairy herd was $142,450. Mr. Huskey testified his appraisal was closer to $153,300.

69. FmHA is not in a first lien position with regard to all of the equipment. However, there was no evidence submitted which would permit a finding as to the value of the first liens held by other creditors or the identity of the equipment in which such first liens are held. However, adversary proceedings have been brought by first lien creditors in which those creditors were permitted to proceed against the equipment in which they had a security interest and in all cases the debt owed the first lien creditor exceeded the value of the collateral. Values utilized in each case are derived from the appraisal of Mr. Whitener, Debtor Exhibit 3.

(a) Sperry Financial (Adversary No. 82–053), by order of December 1, 1982, was permitted to proceed against a "315" bailer, a "489" haybine, and a "1010" bail wagon. Valuation of these items is $6,700.

(b) Piedmont Bank & Trust & Troxler Corporation (Adversary No. 83–0011), by order of February 8, 1983, was permitted to proceed against an Allis-Chalmers "438" corn header, an Allis-Chalmers "99V" plow, and an Allis-Chalmers model "33TL" planter. Valuation of these items is $11,250.

(c) Allis-Chalmers Credit Corporation (Adversary No. 83–1343), by order of February 25, 1983, was permitted to proceed against a grinder with a valuation of $4,250.

(d) John Deere (Adversary No. 82–1343), by order of February 25, 1983, was permitted to proceed against a grinder with a valuation of $4,250.

Thus, the opinion testimony of Messrs. Huskey and Whitener as to the value of equipment in which FmHA holds a security interest should be reduced by $30,200.

## DISCUSSION

### Relief From Stay

The debtors have been laboring under the adversity and difficulties associated with a Chapter 11 bankruptcy since March 12, 1982. There is nothing in the record to indicate that they have been less than hard working and diligent in their attempts to save their dairy herd. However, the evidence indicates and this Court has found that despite the unlimited use of all milk proceed monies derived from the sale of milk since September 21, 1982, the debtors have not been able to increase the productivity of their dairy herd. In fact, the milk base has fallen substantially, creating a substantial loss of daily milk sales at base price, which means that the actual value of the milk base has decreased by $9,255. The testimony of the Plaintiff's witnesses indicated that the dairy herd was not being managed in the most efficient manner and that further, there is some question of disease and sanitation problems. The debtor's operations are in financial reversal, which will of necessity continue without substantial outside financing, which is not available from any source. It therefore appears that the possibility of a confirmable plan under Chapter 11 is virtually non-existent, given the fact that the Government is a creditor in degree greater than 50%, both secured and unsecured, and its consent would therefore be required if the debtor is to be successful in its reorganization effort.

The evidence clearly shows that the government is grossly undersecured, and that the debtors are in serious default, which default continues and grows with passing time, without hope of a turnaround. The debtor is without equity in the property, and the property cannot be held to be needed for reorganization in this case where the prospects for reorganization are not feasible.

█ It thus appears that, barring the consideration of any other aspects of this case, the Plaintiff is entitled to a lifting of the automatic stay for cause, including the fact that its interests are not being protected by the debtor.

### The Milk Assignments

The debtors, however, have raised certain defenses which must be considered before this Court can render a final opinion. The first defense involves the efficacy of the "milk assignment." The debtors argue that the assignment is invalid in that it was not perfected by the filing of a valid financing statement. If that be the case, the Plaintiff still can rely on its security agreements and financing statements to claim a lien on the milk involved. The debtors, however, claim that the government has surrendered any lien it has in the milk by virtue of a paragraph in the milk assignment form which purports to release that lien. The language of the form has already been set out above.

█ After reviewing all the evidence before this Court and interpreting the clear meaning of the language quoted above, it is the conclusion of this Court that the "milk assignment" form is nothing more than a document which memorializes the agreement of the FmHA, Dairymen, Inc., and the debtors that when milk is sold through the dairy the government will release its lien on the milk sold. However, in consideration of that release, the government is to receive $16,000 from the proceeds of the milk sold. No general waiver of any of the government's lien interest afforded by its security agreements and financing statements is intended by this agreement. The government therefore does have valid liens on the debtors' milk and milk proceeds by virtue of its security agreements and financing statements notwithstanding any defects in the "assignment" or the perfection of the "assignment." FmHA did not execute the "as-

signment," but only acquiesced in the debtors' use of a portion of the proceeds.

### Preference

There is no question that the new Bankruptcy Code wrought significant changes concerning the treatment of "floating liens," i.e. security interest in after-acquired inventory or accounts receivable. Under the old Bankruptcy Act, the Courts fashioned a rule which stated that the transfer of an interest in after-acquired property was deemed to relate back to the date the original security interest was given and was, thus, not a transfer for an antecedent debt. *DuBay v. Williams,* 417 F.2d 1277 (9th Cir.1969); *Grain Merchants of Indiana, Inc. v. Union Bank and Savings Company,* 408 F.2d 209 (7th Cir.1969), cert. denied, 396 U.S. 827, 90 S.Ct. 75, 24 L.Ed.2d 78 (1969). No lien could attach until the debtor acquired an interest in the property involved and at that instant the original creditor's security interest was simultaneously perfected (assuming perfection of both liens within any applicable brace). In case of such a tie, the original creditor would take precedence. N.C.G.S. § 25–9–301(1)(b).

At first blush, the Bankruptcy Code at Section 547(e)(1) and (2) seems to follow the holdings of *DuBay* and *Grain Merchants.* The Code, however, then states at Section 547(e)(3), "for purposes of this Section, a transfer is not made until the debtor has acquired the rights in the property transferred." Thus, a transfer can no longer be said to relate back to the creditor's original security interest. It appears, absent anything else, that all security interests in after-acquired property are voidable as transfers for antecedent debts.

However, there is more to be considered, including the two-part "improvement in position" test found at Section 547(c)(5). The first part of the test requires the Trustee to value the collateral involved on the date of the filing of bankruptcy and compare it to the value of the collateral either 90 days before bankruptcy or one year before bankruptcy in the case of "insider" allegations. The test applies only to inventory or receiv-

ables which, in this case, would include either rights arising under the milk assignment mentioned above or the actual inventory of milk sold by the debtors.

The Trustee (or debtors) must prove the value of the collateral at the two relevant dates mentioned above and then show excess value as of the filing date. The Code is not clear on how the Trustee or debtors-in-possession are to prove such valuations. Part two of the improvement of position requires the Trustee (or debtors) to show how any excess in value between the two dates is prejudicial to other creditors holding unsecured claims. Young, "Preferences Under the Bankruptcy Reform Act of 1978," 54 Am.Bankr.L.J. 221, 1980 at page 234.

To the extent that the increase in value occurred as the result of expenditures from the debtors' estate, then a claim of preference might be valid. However, the creditor should be able to retain any profit which results solely from the property covered by its own security interest. In the case at bar, the payments received by the FmHA were not unencumbered assets of the debtors. Had they been unencumbered and had they been applied by the government to the unsecured portion of its uncollateralized debt, then the FmHA might be found to have received preferences to the detriment of unsecured creditors.

The facts are, however, that the milk payments were encumbered by the lien of the FmHA, a secured creditor, and neither the debtors' estate nor any unsecured creditors had any anticipation of receiving any part of these proceeds and, thus, the debtors' estate has not been depleted and unsecured creditors have not been denied any assets from that estate.

The Plaintiff claims a lien on the crops grown by the debtors which crops are specifically intended to serve as feed for the dairy herd. In addition, the equipment used to produce the milk was also provided in large part by the FmHA. The balance of such equipment is covered by mostly junior liens of other secured creditors as listed in Schedule A2 of the debtors' bankruptcy pe-

tition. Thus, it is clear from the record before this Court that no unsecured creditors had any anticipation of receiving any part of the milk proceeds paid by Dairymen, Inc. to FmHA as the result of the milk assignment instrument dated September 25, 1981.

■ The debtors have also claimed that the government misapplied the loan proceeds by crediting them to unsecured portions of its indebtedness. While a statement was entered into evidence showing when the various loan payments were made, no evidence or testimony was introduced by the debtors to indicate which loans were, in fact, undersecured. A problem arises as the result of the multiplicity of promissory notes and security agreements covering collateral which itself has varying longevity. Obviously crops in a security agreement are grown on an annual basis and a creditor's claim to such would last only for that year. However, a security interest in a dairy herd would last many years. When dealing with real estate, it's quite easy to say that the first deed of trust is obviously the most secured. A second deed of trust, depending on the equity in the property, may still be secured but clearly would not be as secure as the first lien. However, when dealing with many notes and security agreements, the issue is much more confused as indicated above. Suffice it to say that the debtors have not introduced evidence in the form of records or testimony which indicates clearly which payments, if any, were applied by FmHA in a preferential manner. Regardless of this argument, however, the fact is that no unsecured creditors had any anticipation of receiving the milk proceed money. Thus, this Court finds and concludes as a matter of law that the milk payments as received by the FmHA in this case are not preferential under the Bankruptcy Code and, therefore, there is no need to discuss or analyze the debtors' claim of "insider" status for the government or its claim to post-petition payments made under Section 548.

### Fraudulent Conveyances

■ The debtors claim that the payments received by the government are in the nature of fraudulent transfers as defined under Section 548 of the Bankruptcy Code. Section 548(2)(A) states simply that the Trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that was made or incurred on or within one year before the date of the filing of the petition if the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation. The uncontroverted testimony and evidence in this case is that the government did not assert its lien in the milk sold to Dairymen, Inc. transactionally, in exchange for receiving a portion of the milk proceeds each month. In many months, the government did not assert its lien on far more milk than was represented by the $16,000 milk proceed check. In fact, in some months, the debtors sold as much as $25,000 worth of milk to Dairymen, Inc. Clearly, the government has more than given a "reasonable equivalent value" to the debtors. The $16,000 received by the government was applied to the loan accounts of the debtors and, thus, reduced their obligation to the government, from proceeds in which it held a valid security interest. There was evidence that the government did not apply $15,776.07 worth of milk proceeds at one point. However, the testimony of the debtor, T. Gerald Beattie, clearly indicated that the payment was made on account of a feed bill at his specific request. Therefore, this Court concludes as a matter of law that no fraudulent transfers have occurred as alleged by the debtors.

### Failure to Make Additional Loan

■ Debtors allege that the County Supervisor of the FmHA led them to believe that additional loans would be forthcoming to the dairy. There is, however, no written evidence of any promise to make such a loan. The only evidence before this Court is the deposition of the County Supervisor, which does not establish that any contract

for an additional loan was entered into. Further, the County Supervisor appears to have exercised his discretion in not making a loan in view of the financial plight of the debtors after July 29, 1981. The debtors are, in fact, asserting an estoppel argument against the government claiming that they relied to their detriment on the "promises" of the County Supervisor. Such an argument cannot prevail. Aside from the lack of any concrete evidence as to a contract for an additional loan, estoppel simply does not run against the federal government under these facts. *FCIC v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *United States v. E.W. Savage and Son, Inc.,* 475 F.2d 305 (8th Cir.1973); *Ray v. United States,* 402 F.Supp. 40 (D.S.C.1975).

### Deferral or Moratorium Relief

The debtors have finally asked this Court to enjoin any further collection or foreclosure action by the FmHA because of the alleged failure of the Secretary of Agriculture to issue regulations setting out guidelines for such relief under 7 U.S.C. § 1981(a). It appears that a request for such relief is inappropriate in this Court, when the issue before the Court is whether a stay should be lifted at the request of a creditor under Section 362.

In the first place, the Court concludes that Section 1981(a) does not require the Secretary to issue such regulations. The Section states in pertinent part:

> In addition to any other authority that the Secretary may have to defer principal and interest and foregoing foreclosure, the Secretary may permit at the request of the borrower the deferral of principal and interest on any outstanding loans made and may forego foreclosure on any such loan upon a showing by the borrower that due to circumstances beyond the borrower's control, the borrower is temporarily unable to continue making payments of such principal and interest when due without unduly impairing the standard of living of the borrower.

The language is clearly permissive. "The Secretary may permit ... and may fore-

go." The general rule is that the word "may" is a permissive word, and when used in a statute or regulation will be construed to vest discretionary power unless the context of its use clearly indicates a purpose to use it in a mandatory sense. See *Burglin v. Morton,* 527 F.2d 486 (9th Cir.1976); *Bennett v. Panama Canal Company,* 475 F.2d 1280 (D.D.C.1973); *Koch Refining Company v. United States Department of Energy,* 497 F.Supp. 879 (U.S.D.C.Minn.1980). As counsel for FmHA argued at the conclusion of the trial of this matter, it is clear that a simple moratium plan as is found in the rural housing program would not be logical in the farmer program area. Not only are the loans more complex, but also the impact both on the borrowers and the national economy is substantially different from that of a housing loan. The housing loan involves relatively smaller amounts of indebtedness and payments over monthly periods of time. The farmer program loans, however, are much larger and are often not due except on an annual basis. Clearly, to grant deferral or moratorium of such large loan payments would have serious economic impact.

The purpose of Section 1981(a) as stated by its sponsor, Congressman W. Henson Moore, was "to clarify the Secretary's authority." It was pointed out that language comparable to that found in Section 1981(a) appears in the housing act with respect to housing loans. Congressman Moore added the language "in addition to any other authority the Secretary may have to defer ..." so that the Secretary's authority under the then current law "would not be reduced or impaired by the proposed amendment." H.R.Rep. No. 95–986, 95th Cong., 2d Sess. (1978).

Also of interest are Senator Eagleton's remarks concerning the passage of the proposed Section 331(a) as Section 119 of the Bill (7 U.S.C. § 1981(a)). Senator Eagleton offers the text of his amendment and his reasons for it as reported in 124 Cong.Rec. S6648–S6650 (Daily Ed. May 2, 1978). This version contains the "may permit" language for deferrals, but contains no foreclosure

forebearance language. Senator Eagleton states:

> I should note that the original form of my amendment gave the Secretary of Agriculture no discretion in the implementation of the loan deferral program. However, as the result of the personal insurance I have received from the Secretary of Agriculture that the loan deferral program will be carried out without interest being charged on interest, I have modified my amendments so that this deferral program will be within the Secretary's discretionary authority. I hasten to add, however, that the poor addition on the charging of interest on interest remains mandatory to this program.

From just a cursory review of the legislative history of 7 U.S.C. § 1981(a), it does not appear to this Court that the language is mandatory nor that the United States has deprived the borrowers of any rights of deferral or foreclosure.

The issue of deferral and moratorium rights as a defense to a relief from automatic stay action should in all cases be carefully considered in the light of all of the circumstances of a particular case. The legislative history is instructive on this point:

> At the expedited hearing under Subsection (e) and at all hearings on relief from stay, the only issue will be the claim of the creditor and the lack of adequate protection or existence of other cause of relief from the stay. This hearing will not be the appropriate time at which to bring in other issues such as counterclaims against the creditor on largely unrelated matters. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the Trustee to recover property of the estate or to object to the allowance of a claim. H.R.Rep. No. 595, 95th Cong., 1st Sess., 344 (1977). See also, *In Re Racing Wheels,* 5 B.R. 309 (Bkrtcy.M.D.Fla.1980).

It appears that often such issues should be brought before this Court in a separate action. It further appears to this Court that the defenses raised by the debtors are often more appropriate as defenses to foreclosure or other separate action and not in limited scope actions to lift the automatic stay. There may well be relief from stay actions in which the Court should entertain such defenses under appropriate circumstances. However, more is to be considered than just the original intent of Congress. Mindful of the Supreme Court's recent decision in *Northern Pipeline Construction Company v. Marathon Pipeline Company,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1983), and the emergency rule adopted by the United States District Court for the Western District of North Carolina, it is the conclusion of this Court that its jurisdiction in an adversary proceeding is limited. See *In Re Lunsford,* 12 B.R. 762 (Bkrtcy.M.D.Ala.1981); *In Re Jones,* 314 F.Supp. 1200 (N.D.Miss.1970). The Bankruptcy Court should not become involved in issues best presented on the merits in non-bankruptcy forums. *In Re Racing Wheels, Inc.,* 5 B.R. 309 (Bkrtcy.M.D.Fla.1980). Thus, while this Court does not feel that the debtors have been persuasive in their arguments that the failure of the Secretary of Agriculture to implement regulations requires an injunction of foreclosure or deferral and moratorium payments, it is the legal conclusion of this Court that the issues should be brought in another forum and the Court, therefore, should abstain from consideration of those issues.

The debtors here are asking the Bankruptcy Court, a court of limited jurisdiction, to determine matters of national policy, which appear should be determined by a court of general jurisdiction, which demands abstention under the facts of this case to permit the appropriate court of general jurisdiction to make such determinations.

### CONCLUSIONS OF LAW

1. All parties are properly before this Court, and this Court has jurisdiction to hear and determine all but one of the issues raised in this proceeding, and as to that

issue (deferral or moratorium relief), the Court concludes that its jurisdiction is at best questionable, and that the Court should therefore abstain, thereby permitting an appropriate court of general jurisdiction, in a separate proceeding, to consider granting or denying relief in connection therewith as may be found appropriate.

2. Relief from the automatic stay should be granted for cause including the absence of adequate protection, the continued financial losses of the debtor, the debtor's defaults, the lack of equity for the debtor, and the absence of feasible prospects for reorganization in the absence of substantial financing, all to the detriment of the FmHA.

3. The "release agreement" is a transactional release of part of the proceeds to which FmHA holds a valid security interest, for the benefit of the debtor, without detriment to the estate or its other creditors, which is *not* a release of FmHA's lien in the future proceeds of milk production under its security documents.

4. FmHA did not execute the "milk release" nor in any way release its valid security interest in milk proceeds from future milk production.

5. FmHA's permitting the debtor to use a portion of its security (milk proceeds) did not constitute a release of its otherwise valid security in milk proceeds.

6. FmHA's allowance of sales, free and clear of lien, transactionally did not constitute a release of its otherwise valid security interest in milk product or proceeds.

7. The partial milk payments received by FmHA are not preferential, in that it held a valid security interest therein, and was undersecured with reference thereto.

8. The transactions in this case between the debtor and FmHA were not fraudulent in any manner, in that the receiving of a portion of the proceeds in which a valid security interest is held by the secured creditor is not fraudulent under the Code or otherwise, under the facts of this case.

9. There exists no valid and enforceable contract between FmHA and the debtor for additional loans.

10. There exist no enforceable rights as of contract or otherwise via estoppel, as such doctrine, rule or theory does not run against the federal government under the facts herein.

11. The jurisdiction of the Bankruptcy Court to determine the issues of deferral or moratorium relief is, at best, questionable, and this Court should abstain therefrom, in order that such determinations may be appropriately made by a court of general jurisdiction.

ORDER

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the automatic stay of Section 362 be lifted, and that the Plaintiff, United States of America, be allowed to pursue its remedies in State or Federal Court as appropriate, and IT IS FURTHER ORDERED that Dairymen, Inc. shall make any further milk proceed payment checks payable solely to the United States of America.