**In re Pleasant Phillip RANKIN, Sr. and Patricia Ann Rankin, Debtors.**

**Bankruptcy No. 83–01803–S–11.**

United States Bankruptcy Court,
W.D. Missouri, S.D.

May 31, 1985.

Gary A. Love, Springfield, Mo., for debtors.

Gary Powell, Springfield, Mo., for Federal Land Bank.

Linda Parker, Asst. U.S. Atty., Kansas City, Mo., for Farmers Home Admin.

## MEMORANDUM OPINION AND ORDER

JOEL PELOFSKY, Bankruptcy Judge.

Phillip and Patricia Rankin, debtors herein, filed a Chapter 11 petition in July of 1983 to reorganize their dairy farm operation. Debtors scheduled their farm at $90,000, farm equipment at $10,575 and 48 head of cattle at $35,650. Federal Land Bank of St. Louis (Land Bank) holds a first deed of trust and Farmers Home Administration (FmHA) a second on the farm real estate. FmHA also claims a blanket security interest in debtors' farm equipment, farm products and cattle. A proof of claim has been filed by Land Bank in the amount of $129,267.72 and FmHA in the amount of $79,326.60.

On January 30, 1984 Land Bank filed a Motion for Relief From the Automatic Stay. An initial hearing was held March 28, 1984. At that time the Court continued the matter on its own Motion to permit debtors to file a § 506 valuation motion and make amendments to their filed disclosure statement. Both debtors and FmHA subsequently filed § 506 motions requesting the Court to value debtors' real estate, farm equipment, and cattle. FmHA also filed a Motion for Allowance of Administrative Expense pursuant to § 503(b)(1)(A). Thereafter Land Bank also filed a motion requesting the Court to Order debtors to provide Land Bank with adequate protection in the form of monthly payments in the event the Court did not grant Land Bank relief from the automatic stay.

At the hearing on these motions debtors appeared in person and by counsel and Land Bank and FmHA appeared by counsel. Evidence was heard and the Court informed the parties that all pending motions would be ruled.

■ The first matter to be resolved is the valuation of debtors' assets. Section 506(a) of the Code provides that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use ... affecting such creditor's interest". The purpose here is to determine the extent of the creditors' secured claims and whether or not Land Bank should be granted a lift of the stay or adequate protection at this time. The standard for determining the value of the property securing a lien is fair market value. *In re Yoder*, 32 B.R. 777 (Bkrtcy.W.D.Pa. 1983).

> "In the usual instance in which the nature of the debtor's prospects are not absolutely clear, the valuation should properly take all material possibilities into consideration and weigh their likelihood in arriving at a value". 3 Collier on Bankruptcy, ¶ 506.04 at p. 506–24.

See also *In re Fursman Ranch*, 38 B.R. 907 (Bkrtcy.W.D.Mo.1984).

■ The evidence shows debtors' farm is comprised of 343 acres, half of which is timberland. A creek bisects the property in half and is known for consistently flooding the bottomlands bordering its banks. A 110 year old cabin serves as the main residence. There is also a Grade C dairy barn and an unspecified number of outbuildings on the property.

Two appraisal witnesses testified as to the value of the farm. Debtors' appraiser, Mr. Compton, valued the property and improvements at $104,500 based upon the use of one comparable sale assuming a reasonable time to sell. If a sale had to occur within six months on a cash basis the witness believed only $80,000 to $85,000 could be obtained—$25,000 of the appraisal was attributable to improvements. The land was valued at $230 per acre for the timberland, $275 per acre for the pastures and $255 per acre for the bottomland. The pastures were valued a little higher due to the thick growth that was currently present and the bottomland a little lower due to the tendency of the creek to flood.

Land Bank's appraiser, Mr. Wills, valued the property at $125,000 of which $12,000 was attributed to improvements. The witness visited approximately 20 sites and used eight of those as comparables in making his appraisal. The witness also acknowledged that a short-term sale would reduce his valuation by 10–15%, which results in a range of $106,000 to $112,500. Due to the fact no lime or fertilizer has been used in several years, the witness questioned the quality of debtors' pastures. Consideration was also given to the fact several fences were completely down. "Slight" weight was given to the flooding creek. As to the market for farm land the witness believed that prices were stabilizing at this time.

The debtor had no independent opinion as to the value of the real estate and did not take issue with the opinions of the two witnesses. The farm is a going business although some repair and investment are required. The appraisals do not vary significantly especially in view of the variables that must be considered in determining the probability of a future event. The Court finds the value of the real estate and improvements to be $120,000.

Little evidence was presented as to the value of the farm equipment. Debtor, Mr. Rankin, stated that his 1955 model milking equipment was purchased in 1979 for $350 but he had no opinion as to the overall value of his equipment. For FmHA, County Supervisor Mike Monger testified that he appraised debtors' equipment in July of 1983 at a value of $14,000. The security agreement and schedules show that debtors' equipment is not that new. Of the three tractors currently in debtors' possession the latest is a 1963 model. The security agreement, dated April 16, 1981, does describe each piece of equipment individually as being in "Good" condition at that time, but there is no indication from the document what value it possessed as of that time. It is also relevant that Monger's appraisal is almost two years old. Not

only would ordinary depreciation affect the accuracy of that appraisal but consideration must also be given to what effect the current economic situation facing the entire farm industry has on the value of the equipment. Based on the foregoing, debtors' scheduled equipment values do not appear to be grossly underestimated and the Court finds debtors' equipment to have a value of $11,000.

The evidence shows there are presently 53 mature Guernsey cows and 18 heifers on the farm. Debtors' disclosure statement values the cattle at $350 per head. This figure is far below the approximately $750 per head that debtors scheduled their herd of 48 head (40 cows, 1 bull and 7 heifers) to be worth. As to the current value of the cattle debtor would only state that Guernseys are worth less than Holsteins which run from $400 to $700 each. Debtors' statement that the cows are presently producing 32 pounds of milk per day is relevant to the question of value. That is not high production. Monger testified that bred heifers are currently worth $500 and mature Guernseys $400 each. Based upon the purported productivity of the herd and the persuasive testimony of FmHA's witness the Court finds debtors' heifers to be worth $500 and the mature cows $400 for a total value of $30,200.

The next matter to be considered is whether or not Land Bank should be granted a lift of the stay or adequate protection at this time. At the earlier hearing the Court continued the matter on its own motion to permit debtors to file a § 506 valuation motion and amend their disclosure statement as directed by the Court. Those amendments were to include debtors' 1982 and 1983 income tax returns, and a summary of both the farm *and Mr. Rankin's* off-the-farm income and expenses over the time this case has been pending. Much of that material has now been filed, although not in a timely fashion.

Mr. Richard Sullivan, a Land Bank vice-president, testified that interest is accruing on debtors' obligation to Land Bank at a rate of $1,320.41 per month. Based upon the valuation of the property and the amount of Land Bank's filed proof of claim it is readily apparent debtors have no equity in the property and Land Bank is undersecured. Debtors have made no payments on the obligation to Land Bank throughout the pendency of the case nor have they proposed any form of adequate protection as to Land Bank's interest. Finally, in light of the fact that Land Bank's own appraisal witness testified that farm property values are stabilizing it is reasonable to conclude the property's value is not depreciating.

In its Motion Land Bank requests that debtors be Ordered to provide adequate protection in the form of monthly payments in the amount of $1,500. The Motion goes on to state this "sum is approximately equal to the monthly accrual of interest and attorney fees with respect to Debtors' indebtedness to Land Bank". As Land Bank is undersecured it would not be entitled to accrued interest or attorney fees. See § 506(b); e.g. *In re Masnorth Corp.,* 28 B.R. 892, 897 (Bkrtcy.N.D.Ga.1983).

The use of periodic cash payments as a form of adequate protection is generally intended to protect a secured creditor's interest in collateral that depreciates while the automatic stay remains in effect. Yet several courts have considered the use of periodic cash payments which include an interest component to compensate the secured creditor's loss of value by being deprived the right to liquidate its collateral and reinvest the resulting proceeds. See *In re Monroe Park,* 17 B.R. 934 (D.Del. 1982); *In re Virginia Foundry,* 9 B.R. 493 (W.D.Va.1981); *Matter of Anchorage Boat Sales, Inc.,* 4 B.R. 635 (Bkrtcy.E.D.N.Y. 1980). In both *Monroe* and *Anchorage Boat Sales* the automatic stay was lifted because the debtor had failed to provide protection which encompassed this aspect of the creditor's interest. In *Virginia Foundry* the case was remanded to the Bankruptcy Court in order that a plan could be formulated that took into consideration the creditor's right to reinvest its

collateral and provide protection accordingly for having that right delayed.

The Supreme Court has long held that there is no taking where the bankruptcy proceeding only postpones the exercise of the creditor's rights. *Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Railway Co.,* 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

"The injunction here in no way impairs the lien, or disturbs the preferred rank of the pledgees. It does no more than suspend the enforcement of the lien by a sale of the collateral pending *further action. It may be, as suggested, that during the period of restraint the collateral will decline in value; but the same may be said in respect of an injunction against the sale of real estate upon foreclosure of a mortgage; and such an injunction may issue in an ordinary proceeding in bankruptcy. *Straton v. New,* 283 U.S. 318, 321, 51 S.Ct. 465, 75 L.Ed. 1060, and cases cited. A claim that injurious consequences will result to the pledgee or the mortgagee may not, of course, be disregarded by the district court; but it presents a question addressed not to the power of the court but to its discretion—a matter not subject to the interference of an appellate court unless such discretion be improvidently exercised". 294 U.S. at 676–77, 55 S.Ct. at 606.

In two recent cases the Court of Appeals for the Eighth Circuit has considered questions of adequate protection. *In re Monnier Brothers,* 755 F.2d 1336 (8th Cir.1985); *In re Martin, et al.,* 761 F.2d 472, (8th Cir.1985). *In Monnier,* the question was considered in the context of confirmation but in *Martin* it was considered, as here, in the context of the use of cash collateral.

■ To determine adequate protection, "the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence". (p. 476).

Here the Court has established a value. The risks attendant upon the use of the cash collateral, the land, are nominal. True enough that rural land values are depressed. They are not likely to fall farther, Land Bank's witness testified. The real problem is not the falling of prices but the time necessary to find a buyer. Over that period of time the function of adequate protection is to maintain the equilibrium between the value of the collateral and the amount of the debt where, as here, the collateral does not depreciate. The appropriate measure of that protection is the interest which accrues on the debt.

■ Under § 506(b) of the Code, an undersecured creditor, as here, is not entitled to accrue interest after the date of filing. Thus interest may not be awarded as interest but the same amount may be awarded in another guise. Here the sum is to be paid to maintain the relationship between the amount of the debt and the value of the collateral established at the time of filing. This payment maintains the value of the bargain struck before bankruptcy between the parties and also permits the debtor time to reorganize, thus fulfilling the policy of the Bankruptcy Code. Beginning in June 1985, debtors are to pay to Land Bank the sum of $1,320.00 per month as adequate protection for use of the real property.

There also pends FmHA's Motion for Allowance of Administrative Expense pursuant to § 503(b)(1)(A). Section 503(b)(1)(A) grants an administrative expense to an entity for "the actual, necessary costs and expenses of preserving the estate ... rendered after the commencement of the case".

FmHA's memorandum in support of its motion reflects that copies of both FmHA's motion and the memorandum in support thereof were served upon debtors' attor-

ney. The substance of the memorandum states—

> "... debtors' attorney unilaterally cancelled a milk assignment from Mid America Dairymen, Inc. to Farmers Home Administration covering 30% of the debtors' monthly milk sales. As of the date of cancellation, Farmers Home Administration was receiving $800 per month. Since that time, this creditor has received no milk proceeds, which had been pledged by the debtors as security for their debt to Farmers Home Administration. This creditor believes that the purpose of the unilateral termination of the assignment of proceeds was to provide the debtors with operating cash".

Debtors filed no response to the motion and neither party presented any evidence on the issue at the hearing. Although both parties were directed to file briefs on the issue, neither has done so. For purposes of ruling this issue the Court will take as admitted the facts as set out in FmHA's Motion and in the documents attached to FmHA's filed proof of claim which evidences FmHA's security interest.

■ The security agreement executed by the debtors granted FmHA a security interest in various categories of collateral, one of which included "[a]ll livestock ... other farm products ... now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto ...". The financing statement filed by FmHA stated that the security interest "covers the following types or items of collateral, including proceeds and products thereof: ... livestock, other farm products ...". Section 400.9–109, R.S.Mo.1969 defines farm products to include "products of ... livestock in their unmanufactured states (such as ... milk ...)". Debtors have not contested the validity of FmHA's security interest or its perfection. Regardless of any assignment, by virtue of its perfected security interest FmHA has a valid lien on all of debtors' milk and milk proceeds. See *In re Beattie*, 31 B.R. 703, 713 (Bkrtcy.W.D.N.C.1983). FmHA's security interest continues in debtors' milk and milk proceeds notwithstand-

ing the filing of debtors' bankruptcy petition. See § 552(b). Furthermore, post-petition milk proceeds are cash collateral. See *Matter of Hollie*, 42 B.R. 111, 119–120 (Bkrtcy.M.D.Ga.1984).

■ There is no cash collateral Order on file to permit debtors to use *any* milk proceeds. In the case of *In re Aerosmith Denton Corp.*, 36 B.R. 116 (Bkrtcy.N.D.Tx. 1983) the debtor also used cash collateral without court authorization. The court granted the creditor not only a replacement lien on other property but, to the extent the lien did not fully protect the creditor a priority administrative claim. 36 B.R. 119. Here debtors have no unencumbered property upon which FmHA can be granted a replacement lien. Accordingly, FmHA shall have an administrative priority claim to the extent debtors have used FmHA's cash collateral without court authority. Debtors may use cash collateral only to the extent FmHA permitted such use before debtors' bankruptcy case was filed. The balance of the milk payment is to be paid to FmHA commencing June 1, 1985 as received.

Debtors are also directed to file an amendment to their disclosure statement within ten (10) days of this Order which summarizes Phillip Rankin's off-the-farm income from the day debtors' Chapter 11 petition was filed through the date of this Order and within ten (10) days of the date of this Order file a Motion for the Use of Cash Collateral.