In re Danny Jo VANAS and Therese Marie Vanas, Debtors.

No. 85–01001–R.

United States Bankruptcy Court, E.D. Michigan.

July 8, 1985.

Michael D. McCulloch, Lansing, Mich., for debtors.

D. Keith Birchler, Bay City, Mich., for Federal Land Bank.

John P. Timmony and Michael H. Traison, Detroit, Mich., for Production Credit Ass'n.

## SUPPLEMENTAL MEMORANDUM REGARDING DEBTORS' MOTION TO USE CASH COLLATERAL AND CREDITORS' MOTIONS TO LIFT THE AUTOMATIC STAY

STEVEN W. RHODES, Bankruptcy Judge.

### I.

This matter is before the Court on the debtors' application for use of cash collateral, and on two separate motions to lift the automatic stay filed by the Production Credit Association and the Federal Land Bank. Following an evidentiary hearing, the Court granted the debtors' motion and denied the creditors' motions. This supplemental memorandum is entered in further explanation of the decision.

The debtors, Danny Jo Vanas and Therese Marie Vanas, own and operate a dairy farm in Isabella County, Michigan. They have lived on the farm for eleven years, having rented it for four years before purchasing it. The farm consists of 80 acres of land on which feed for the dairy herd can be grown.

In 1984, Isabella County experienced a severe drought, which devastated the debtors' crops. As a result, they applied for a disaster loan from the Farmers Home Administration (FmHA), and this was approved. Thereafter, on March 29, 1985, the debtors filed a petition for reorganization under the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

The debtors' two principal creditors are the Production Credit Association of Alma (PCA) and the Federal Land Bank of St. Paul (FLB). The debtors owe the FLB approximately $117,000. The FLB is a primary lender for farm real estate, and holds a first mortgage on the debtors' farm property. The mortgage was duly recorded on March 8, 1982, and is the only collateral securing the debt to the FLB. The debtors' property contains an oil well, which was first drilled in October of 1983. The FLB claims the right to any oil proceeds pursuant to a provision in the mortgage which grants the mortgagee the rights to royalties, licenses, or rents produced from minerals in the property.

The debtors owe PCA a total of $78,119.25. PCA claims a security interest in the debtors' machinery, equipment, livestock, products and proceeds thereof, accounts and contract rights, and crops growing or to be grown. With the exception of two purchase money security interests of relatively minor value, PCA is the senior secured party with respect to the debtors' nonreal estate property. PCA also has a junior interest in the debtors' farm real estate.

In connection with their debt to PCA, the debtors' executed a milk proceeds assignment with their sole milk purchaser, Kraft Dairy Farms. Pursuant to the assignment, Kraft issues checks in payment for the debtors' milk production which are payable jointly to the debtors and PCA.

The debtors have filed an application for use of cash collateral. Specifically, the debtors seek to use milk proceeds, which is the farm's primary income, for the necessary expenses of operating the farm and preserving the collateral. 11 U.S.C. § 363(e) grants the court the authority to prohibit or condition such use "as is necessary to provide adequate protection of such interest."

In addition, the FLB and the PCA have filed separate motions to lift the automatic stay. 11 U.S.C. § 362(d) provides that the court shall grant relief from the stay:

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

## II.

### A. *The Debtors' Position*

#### 1. *Regarding PCA*

The debtors contend that they were forced into bankruptcy because of the combined effect of the 1984 drought and PCA's taking a substantial part of milk proceeds in the wake of that disaster. The debtors contend that because of the drought they did not grow enough corn and alfalfa to feed their herd, and had to borrow money from the PCA. The debtors maintain, however, that after the PCA had taken its part of the milk proceeds and other mandatory deductions were made, there were insufficient funds for the purchase of seed and feed for the cows. According to the debtors, insufficient feed resulted in a complete loss of milk production prior to the filing of the bankruptcy petition.

Further, because prior to the filing of the petition in bankruptcy the cows were not producing enough milk for it to be sold, PCA at that time appraised the cows according to prevailing market prices for beef cattle, which are lower than prices for dairy cattle. Citing 11 U.S.C. § 506(a), which provides that for purposes of determining secured status, the value of collateral shall be determined in light of the purpose of the valuation and of the proposed disposition or use of the property, the debtors contend that the PCA is entitled only to adequate protection of the value of the herd according to prevailing beef prices.

The debtors maintain that because of proper feeding made possible by newly available funds, the cows are now producing milk for sale. Also the herd has increased in number. Therefore, the debtors contend that the value of the livestock has increased since the filing of the bankruptcy petition. Nevertheless, the debtors contend that "(e)quitable considerations mandate that PCA should not be permitted a higher value of its secured claim than the value of the livestock as of the date of filing the petition." (Brief in support of use of cash collateral, p. 4)

Moreover, the debtors maintain that the increase in value of the cattle affords the PCA adequate protection for the use of its collateral. The debtors assert that the passage of time has created and will continue to create an equity cushion, which is adequate protection for the use of the PCA's collateral provided that funds are available for the feeding and care of the livestock. 2 *Collier on Bankruptcy*, § 361.01 (15th ed. 1985); *In re Stein*, 19 B.R. 458 (Bkrptcy.E. D.Pa.1982); *In re Hollie*, 42 B.R. 111 (Bkrptcy.M.D.Ga.1984). Therefore, the debtors conclude that they should be permitted to use cash collateral to feed, care for, and protect the livestock because "(s)uch use of the proceeds would provide PCA with adequate protection of its collateral by increasing its value, would provide necessary funds for reorganization, and would increase funds available for the unsecured creditors." (Brief in support of use of cash collateral, p. 4). *Dahlquist v. First National Bank of Sioux City, Iowa*, 40 B.R. 969 (D.S.D.1983), *affirmed in part, appeal dismissed in part*, 737 F.2d 733 (8th Cir.1984), later proceeding, 751 F.2d 295 (8th Cir.1985).

In their proposed plan for adequate protection, the debtors maintain that their equipment is decreasing in value much more slowly than the increasing value of the herd. *In re Stein, supra.* The debtors state that they will maintain risk insurance on the equipment, payable to PCA as first secured party, and that with the milk proceeds they will repair the equipment as part of the ordinary operation of the farm.

The debtors further contend that because PCA took a higher percentage of the milk proceeds prior to the debtors' filing of the bankruptcy petition, despite its knowledge that the cows were not fed due to insufficient funds for feed, PCA's postpetition security interest in the milk proceeds should be abrogated pursuant to 11 U.S.C. § 552(b). If such interest is not abrogated, the debtors maintain that they are entitled to deduct from the gross proceeds available for distribution to creditors their costs and expenses in generating the proceeds. 11 U.S.C. §§ 506(c) and 552(a); *In re Hamilton*, 18 B.R. 868 (Bkrptcy.D.Colo.1982).

Lastly, the debtors contend that PCA is not entitled to interest on its claim as adequate protection during the administration of the estate. In this regard, the debtors note that *In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984), relied on by PCA, "is a departure from well-settled interpretations of the code." (Brief in support of use of cash collateral, pgs. 10–11); *In re W.S. Sheppley & Company*, 45 B.R. 473, 481 (Bkrptcy.N.D.Iowa 1984). In addition, the debtors contend that pursuant to 11 U.S.C. §§ 506(b) and 502(b)(2), interest, fees, and costs are not allowed on a secured claim when the creditor is undersecured, as is the PCA. 3 *Collier on Bankruptcy*, § 506.05 (15th ed. 1985).

## 2. *Regarding The FLB*

In their plan of adequate protection, the debtors contend that as first mortgagee, the FLB remains insured under their hazard insurance policy for the real estate. The debtors maintain that they are also willing to segregate and account for all oil proceeds collected as royalties from the oil well on their property, and to pay net oil proceeds to the FLB as protection against any possible decrease in the value of the property, or to be applied against the value of the FLB's secured claim in the bankruptcy estate.

## 3. *Debtors' Witnesses*

a. The debtor, Danny Jo Vanas, testified that he planted 60 acres of corn in the spring of 1984, but that because of the drought and the poor crops yielded, he was forced to borrow money to purchase feed. Vanas testified that as he borrowed funds, the milk assignment to the PCA increased. The debtors' submitted an exhibit which indicates the percentage of milk proceeds taken by PCA, and the debtors' net proceeds from April of 1984 through March of 1985. The exhibit indicates that in January and February of 1985, prior to the filing of the petition in bankruptcy, PCA took 89 and 77 percent of the proceeds respectively, and that the debtors were left with no net proceeds.

Vanas testified that prior to the filing of the petition, Pat Koester of the PCA wanted to sell the cattle as beef, and that beef cattle are worth less than dairy cattle. Vanas stated that at the time he filed for reorganization, he was milking only 12 cows. He further stated that since filing, his herd has increased by 7 calves and 3 heifers. An exhibit submitted by the debtors indicates that on May 10, 1985 there were 14 cows milked, and that an average of 21.6 pounds of milk per cow per day was produced.

Vanas stated that he has received three checks for milk since the date of filing in the amount of $88, $164, and $353. Vanas also indicated that he expects milk production to increase as 10 cows are freshened during the summer months and as the cows are fed better hay. In this regard, Vanas stated that he used milk proceeds and his income tax refund check to plant 55 acres of corn and 10 acres each of wheat and rye, and that he entered into oral agreements to rent land for crops prior to filing for reorganization.

Vanas estimated that his livestock and equipment are worth $25,000. He valued his real estate at $56,000 based on the fact that comparable farms in Isabella County are not selling at the prices requested, and on the fact that work remains to be done on both his house and the farm buildings. Vanas expressed his opinion that his property is necessary for an effective reorganization because it is where he and his family live, grow crops, and raise dairy cows.

On cross-examination, Vanas stated that he cannot recall if his farm ever generated

a profit. He stated that the farm was never at full production of 70 cows, and that the most cows he ever had was 64 in 1978–79. Vanas testified, however, that his wife's income is generally used for living expenses, and that in previous years the family was able to pay its bills.

Vanas also stated on cross-examination that he received his first oil royalties check in 1984, and that it was for $14,000.

b. Therese Marie Vanas stated that her 2 oldest children, ages 14 and 11, help out on the farm on a regular basis and are not paid. She further stated that she and the children would work on the farm in an effort to successfully reorganize.

c. Daniel Ramp, a self-employed certified public accountant, testified concerning a financial forecast he prepared for the debtors based on forecasted statements of cash receipts and disbursements.

Ramp stated that the assumptions underlying the forecast are based on general dairy information provided by Michigan State University and on more specific information provided by the debtor, Danny Jo Vanas. Ramp also stated that his report is a conservative projection, and does not include payment of the principal and interest of the FmHA disaster loan since he was unable to predict the payment schedule. Ramp stated that his report indicates that at the end of 20 months, assuming no catastrophes, the debtors should have approximately $56,000 cash on hand. Ramp concluded that in his opinion, the debtors could successfully reorganize.

■ On cross-examination, Ramp stated that his forecast assumes a full 305-day lactation period, and that his projections would change if cows dropped calves late, or if the calves were fed whole milk, which is usually sold, rather than replacement milk. Ramp also acknowledged that when he prepared the projection, he was unaware that the proceeds of FmHA disaster loans cannot be used to purchase cattle, and that this limitation would also produce significant variations in his forecast.[1]

d. Glenn Irwin, a hardware store owner with an extensive background in dairy farming, stated that for the last two years, he has inspected the debtors' cows about every two weeks. Irwin testified that the debtors produced virtually no crops in 1984 because of the drought, and that he first noticed the worsening condition of the Vanas cows in the fall of 1984. Irwin reported that in March of 1985 the cows were thin, but were not in imminent danger of death. Irwin further stated that he has been to the Vanas farm at least six times since the filing of the petition in bankruptcy, and that he has seen a steady improvement in the condition of the herd. According to Irwin, the cows are now eating hay of a mediocre quality, and their improvement would be more dramatic if they were given alfalfa, which is a higher quality feed.

Based on the fact that milk production is "adequate" and the cows have produced good calves, Irwin expressed his opinion that the debtors' herd could be rehabilitated. He also stated that if the debtors watched their costs, they could have a successful dairy operation. Irwin expressed his willingness to counsel the debtors concerning the reorganization of their farm.

On cross-examination, Irwin stated that if cows are too severely stressed, nature aborts their calves. He also stated that the

1. The Court took under advisement the creditors' objection to Ramp's testimony based on the fact that he was not properly appointed as the debtors' accountant pursuant to 11 U.S.C. § 327.

The PCA and the FLB have submitted no case law in support of their objection to Ramp's testimony. Nor was the Court able to find any authority for the proposition that the accountant's relevant evidence should be suppressed merely because he was not properly appointed.

Congress intended to place the responsibility for payment of professionals directly under the jurisdiction of the bankruptcy court. *In re First Federal Corp.*, 43 B.R. 388, 389 (Bkrptcy.W.D.Va. 1984). The Court must conclude that the possibility of nonpayment for services performed is a sufficient motivation to encourage compliance with the necessary appointment procedures, and that the exclusion of relevant evidence is too harsh a sanction.

For the above reasons, the Court will admit and consider the testimony of Daniel Ramp.

last two years have had a depressing effect on farm profits, and that property values have declined.

### B. *PCA's Position*

#### 1. *Legal Argument*

PCA contends that this case presents an irreconcilable conflict concerning the use of cash collateral. *Dahlquist v. First National Bank of Sioux City, supra.* PCA contends that the debtors' milk payments remained static, but that because the cows were not producing milk, it seemed like an increasing amount was taken out of their milk checks by the PCA. PCA offers several reasons to support its contention that the debtors cannot offer adequate protection.

First, PCA notes that the debtors are not making payments to the FLB, the senior secured party on the real estate, and that any equity in the real property is therefore being eroded by the accrual of interest on the FLB debt. *Cf. Matter of Hollie, supra.* In addition, PCA contends that equity is also eroded by the accrual of real property taxes and by the accrual of interest on its debt.

Second, PCA contends that proceeds from the sale of both milk and oil have been depleted, and that the debtors have not suggested how they propose to replace the funds. PCA asserts that although the debtors could possibly use milk proceeds to *maintain* the cows, use of the proceeds would not *increase* the value of the collateral commensurate with each dollar consumed. *In re Berens,* 41 B.R. 524 (Bkrptcy.D.C.Minn.1984); *In re Irving A. Horns Farms, Inc.,* 42 B.R. 832 (Bkrptcy. N.D.Iowa 1984); *In re Aled Corp.,* 47 B.R. 257 (Bkrptcy.E.D.Pa.1985).

Third, PCA maintains that the value of the debtors' machinery and equipment is depreciating with time and use. The PCA further contends that the debtors have no cash to maintain and repair the equipment, and that use of the milk proceeds "would diminish part of PCA's security under the guise of preserving another part of PCA's security." (Brief in support of PCA's response, p. 12)

Fourth, PCA contends that the livestock are growing older and less salable with the passage of time. In this regard, PCA notes that the cows have been stressed because of lack of adequate feed, and that the debtors have not been able to afford veterinary care.

Fifth, PCA notes that real property values are falling in Isabella County, and predicts that milk prices will fall because of proposed government legislation.

PCA also contends that it is entitled to interest payments as adequate protection for the delay in enforcing its right of foreclosure caused by the automatic stay. *In re American Mariner Industries, Inc., supra.* In this regard, the PCA contends that the lost opportunity to reinvest the proceeds of a foreclosure sale costs it the current rate of interest on the amount of collateral it possesses.

PCA contends that because there is no adequate protection, the automatic stay should be lifted so that it can foreclose on its collateral. PCA contends that the stay should be lifted for the further reason that the debtor has no equity in the property, and it is not necessary for an effective reorganization. As to the latter, the PCA maintains that the debtors are unable to reasonably predict that continued operation of their farm will result in proceeds sufficient to pay their costs. *In re Clark Technical Associates, Ltd.,* 9 B.R. 738, (Bkrptcy.D.Conn.1981). Based on the debtors' testimony that prior to the filing of the petition in bankruptcy, they did not earn enough money from the operation of the farm to cover their operating expenses or make a profit and that they do not expect to produce enough milk during the present lactation period to cover costs, the PCA concludes that the debtors have not demonstrated a reasonable likelihood of a successful reorganization within a reasonable period of time. *In the matter of Sundale Associates, Ltd.,* 11 B.R. 978 (Bkrptcy.S.D. Fla.1981); *In re Beattie,* 31 B.R. 703 (Bkrptcy.W.D.N.C.1983); *In the matter of Dias,* 24 B.R. 542 (Bkrptcy.D.C.Idaho 1982). The PCA also contends that the

debtors do not keep adequate records of their dairy farm.

## 2. PCA's Witnesses

a. Adrian Van Lonkhuyzen, an employee of the Farmers Home Administration and county supervisor since 1974, testified that Danny Jo Vanas applied for a disaster loan in December of 1984.

Van Lonkhuyzen stated that the FmHA made a conditional loan, but that proceeds were not released because a decision was made that the debtors would not be able to pay back the loan. Van Lonkhuyzen stated that this decision was based on the condition of the farm and the cows, the fact that Vanas had overvalued the cows and equipment on the appraisal he submitted to the FmHA, and the fact that the PCA would not lower its milk assignment. Van Lonkhuyzen testified that he made a field inspection to the Vanas farm in March of 1985, and that the cows looked skinny and undernourished.

Van Lonkhuyzen expressed his opinion that better management of the farm would improve the health of the cows. He further stated that it could take one to two lactation periods to return the cows to a healthy state and to determine if the cows could reach the break-even point of 45 pounds of milk per cow per day.

On cross-examination, Van Lonkhuyzen admitted that he was last at the farm on March 8, 1985, and that his opinion regarding rehabilitation is based on this visit. He also stated that dairy cows are worth more than beef cows.

b. Lyle Thompson, who is employed by Michigan State University as County Extension Director, stated that he was a dairy farmer for seven years. Thompson described an electronic record keeping system used in farm management analysis and operated by Michigan State University. Thompson stated that Vanas subscribed to the service in 1984, but could not recall if Vanas subscribed before or after that time.

Thompson testified that he performs personal field inspections upon request, and that he first visited the Vanas farm in 1977–78, and that his last visit was in April of 1985. Thompson stated that the quality of Vanas's soil makes the farm hard to manage, and that the problem was compounded by the drought in 1984.

Thompson further stated that from 1984–1985, the debtors' milk production has been below average, and that their cows were undernourished for the expected level of production. He expressed his opinion that in April the cows were not in a state to continue as a profitable operation, and noted that it is difficult to bring back to full production cows that have been under stress. When questioned as to whether the debtors have responded to his recommendations in the past, Thompson indicated that they had in the short run.

On cross-examination, Thompson stated that the debtors have good clay loam soil but poor drainage, and that tiling could increase the crop yield by one-third.

c. Patrick William Koester, PCA's branch manager in charge of loans, stated that he was involved in making the debtors' loans, which total about $78,000. Koester stated that he regularly inspects dairy farms, and that he has visited the debtors' farm approximately ten times. He stated that on one of his last visits, the cows were in poor shape and appeared stressed from improper feeding.

Koester stated that on February 6, 1985, he appraised the debtors' equipment at $17,800, and the livestock at approximately $300 per cow as beef prices, for a total of $10,950.

On cross-examination, Koester testified that in January of 1985 the cows were "in decent shape." He described the increasing percentage of milk proceeds taken by PCA, and stated that when a loan was made in March of 1985 to provide feed for one week, he did not expect any more milk production from the herd.

Koester expressed his opinion that the debtors cannot feasibly continue in business, and that it is in their own best interest to get out of farming.

d. Terry Yarhouse, who has worked with Pat Koester on the Vanas account since March of 1985, stated that the condi-

tion of the cows has improved since the filing of the petition in bankruptcy. Yarhouse stated that he last saw the cows on May 2, 1985, and that they were not carrying the flesh they should have, but appeared better fed than in previous months. Yarhouse stated his opinion that because of stress, the herd has a diminished ability to return to their full potential.

On cross-examination, Yarhouse acknowledged that the value of the cows increased between March 28, 1985 and May 2, 1985.

### C. FLB's Position

#### 1. Legal Argument

The FLB contends that the royalties received under the oil and gas lease are cash collateral of its perfected interest in the debtors' real estate. *In re Wagner*, 30 B.R. 554 (Bkrptcy.W.D.Pa.1983); 11 U.S.C. § 363(a). The FLB further contends that because the value of the mortgaged property is declining, it lacks adequate protection.

The FLB requests that the debtor be ordered to turn over all further royalty checks to the FLB for application on the mortgage note. The FLB also seeks relief from the automatic stay to pursue its remedies under state law for foreclosure of the debtors' mortgage.

The FLB also contends that it is entitled to interest payments as adequate protection for the delay in effecting a foreclosure caused by the automatic stay. *In re American Mariner Industries, Inc., supra.*

#### 2. FLB's Witness

William J. Maddix, a loan officer at the FLB, stated that he is in charge of the Vanas loan. Maddix stated that a loan was made to the debtors in December of 1981 or January of 1982 to enable them to refinance their mortgage, complete construction of their house, and purchase more cattle. Maddix stated that the debtors' monthly payments are approximately $1000 with a variable interest rate, and that they are now 9 months in default, and are delinquent in taxes and insurance on the buildings. Maddix stated that as of May 1, 1985, the debtors were in default by $10,-662.80. He further stated that because the balance will be $133,855.00 in 13 months if the interest rate remains the same, the FLB is not adequately protected even if it is allowed to foreclose because it will sustain a loss before it is able to take possession.

Maddix stated that his primary job responsibility is making loans and appraising real estate. Maddix testified that he most recently appraised the Vanas farm on May 15, 1985, and that he determined the property to be worth $138,000, with $80,000 assigned to the value of the land and $58,-000 to the buildings.

Maddix testified that the $138,000 figure is based on market values in the county, and that he arrived at that figure by examining the sale of 18 comparable farms and by making adjustments for the size of the farm and the quality of the land. Maddix further stated that the normal appraisal is based on either a streamlined benchmark approach or on the sale of 3 comparables.

During voir dire by the Court, Maddix stated that the 18 comparable sales were made between September of 1983 and May of 1985, and that none of the sales involved dairy farms. He indicated, however, that it is typical in the industry to use cash crop farms as comparables for dairy farms and to make adjustments for the buildings. He also stated that the fact that some of the 18 sales were made to dairy farms indicates that dairy farmers are willing to pay comparable rates.

Maddix acknowledged that for the past 12 months there has been a 9% decline in property values which is expected to continue, but stated that because some of the comparable sales evidenced this decline, the 9% decrease in values is partly reflected in the $138,000 appraisal.

Reviewing the milk production standards for the dairy industry, Maddix expressed his opinion that a farmer who abides by only some of those standards cannot reach the average milk production per year. He also expressed his opinion that the debtors cannot reach the industry standard and become profitable.

Maddix further stated that the debtors' loss in crops as a result of the 1984 drought was more than offset by the 1984 oil royalties check, and that the loss offset could have purchased feed at $2.75/bushel.

## III.

The first issue is the extent of the creditors' interests in the debtors' property. The second issue is whether there is "adequate protection" of those interests under §§ 362(d)(1) and 363(e). Finally, it can be determined whether the stay should be lifted because the property is not necessary for an effective reorganization under § 362(d)(2).

### A. *The Creditors' Interests In The Debtors' Property*

■ Pursuant to § 362(g), the party requesting relief from the automatic stay has the burden of proof on the issue of the debtor's equity in the property. Because that issue involves a determination of the value of the property, the creditors also have the burden of proof on the issue of valuation.

The Bankruptcy Code is silent as to the burden of proof under § 363; accordingly, the Court will assume that the same burdens apply under §§ 362 and 363.

11 U.S.C. § 506(a), which governs the determination of secured status, provides that the value of the property shall be determined "in light of the purpose of the valuation and of the proposed disposition or use of such property." Section 506(a) also provides that a creditor has a secured claim to the extent of the value of his collateral at the time the petition is filed, and an unsecured claim for the balance of his claim.

### 1. *FLB's Interest*

It is undisputed that the FLB has a security interest in the debtors' real property in the form of a first mortgage. The parties disagree, however, as to the extent of that interest.

The debtors owe to the FLB a total of approximately $117,000. Based on the appraisal of William J. Maddix, the FLB contends that the debtors' real property is worth $138,000. The debtor, on the other hand, values his property at substantially less; based on his observation that land in Isabella County is not selling at the prices requested, the debtor submits that his real property is worth $56,000.

Because the Court is not entirely satisfied with the method of analysis used in the Maddix appraisal, the Court must conclude that the FLB has not met its burden of proof on the issue of valuation.

The Court's primary concern with the Maddix appraisal stems from the use as comparables of 18 sales of farms in Isabella County between September of 1983 and May of 1985. Because the past 12 months have evidenced a 9% decline in property values, the use of sales which occurred more than one and one half years prior to the filing of the debtors' petition in bankruptcy produces uncertain results and undermines the credibility of the entire appraisal. Further, the Court is concerned that farms on the market in Isabella County have not been selling at their appraised values, and there have been only two sales since October of 1984.

Finally, the fact that none of the 18 comparable sales involved dairy farms, but were sales of cash crop farms, undermines the accuracy of the appraisal.

Although the Court has concluded that the Maddix appraisal is too high, the Court must also conclude based on the evidence presented that the property is worth more than $56,000. Because it is difficult for the Court to establish the value of the property, the Court will evaluate its worth at approximately $117,000 for purposes of this proceeding. Therefore, the Court must conclude that the FLB was fully secured as of the date of filing, with no equity cushion or margin for error.[2]

---

**2.** In light of this finding, it will not be necessary to determine if the PCA has adequate protection as a junior secured party with respect to the real property since the PCA's interest in it was not adequately protected prior to the filing of the petition in bankruptcy. Therefore, the PCA's interest in oil, which arises from its second mortgage, is also unsecured.

## 2. PCA's Interest

■ The PCA holds a lien in the debtors' machinery, equipment, livestock, crops, and proceeds. In a motion to lift the automatic stay, the moving creditor has the burden of proof as to the validity and perfection of its security interest in the debtor's property. *Irving A. Horns Farms, Inc.*, 42 B.R. at 836. The evidence presented at the hearing raised some question as to the validity of the filing because of the absence of signatures on the copies of certain security agreements produced in court. However, in the absence of evidence to the contrary, the Court will conclude that the original security agreements were filed and therefore signed, and that the PCA is a secured creditor.

### a. Cows And Machinery

At the time of the filing of the debtors' petition in bankruptcy, the PCA appraised the livestock at $10,950 and the machinery and equipment at $17,800. The Court must conclude that the PCA has met its burden of proof as to value.

### b. Crops And Milk Proceeds

The debtor testified that he used milk proceeds and his income tax refund to plant 55 acres of corn and ten acres each of wheat and rye. To the extent that the seed was purchased with funds other than milk proceeds, the PCA does not have a security interest in crops growing in the ground. Thus, the extent of the PCA's security interest in the debtors' crops is not clear. Regardless, the Court must conclude that the PCA's security interest in milk proceeds, and therefore in crops purchased with those proceeds, should be abrogated pursuant to 11 U.S.C. § 552(b).

Section 552(b) provides that a security agreement which was entered into prior to the commencement of the bankruptcy case and which extends to prepetition proceeds in the property also extends to postpetition proceeds provided for in the security agreement and by applicable nonbankruptcy law "except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." Section 552(b) recognizes a distinction between after-acquired property and proceeds generated from prepetition collateral, and is a narrow exception to the general rule stated in § 552(a) that after-acquired property is not subject to any lien resulting from a security agreement entered into by a debtor prior to the filing of a petition in bankruptcy. *In re Nielsen*, 48 B.R. 274, 276 (D.N.D.1984).

Initially, the Court notes that there is a disagreement in the cases as to whether milk is the "proceeds, product, offspring, rents or profits" of prepetition livestock within the meaning of § 552(b), or whether milk produced post-petition is an asset coming into existence totally after the filing and not intended to be covered by the § 552(b) exception. *In re Nielsen, supra; In the matter of Johnson*, 47 B.R. 204, 207 (Bkrptcy.W.D.Wis.1985); *In re Lawrence*, 41 B.R. 36, 38 (Bkrptcy.D.C.MN.1984). However, in light of this Court's conclusion that pursuant to § 552(b), PCA's security interest in milk proceeds must be terminated, the Court need not address this issue.

■ The application of equity found in § 552(b) requires a careful analysis of the circumstances in which each case arises, thereby precluding the formulation of a strict rule of law. *In the matter of Johnson*, 47 B.R. at 207. Section 552(b) requires a balancing of the equities of each case. In the course of such consideration, the Court evaluates the expenditures of time, labor, and funds relative to the collateral, the relative position of the secured party, and the overall rehabilitative theme of bankruptcy law. *In re Lawrence*, 41 B.R. at 38.

In *In re Lawrence, supra*, the court held that milk produced post-petition is not intended to be covered by the § 552(b) exception. Alternatively, the court used its equitable discretion to abrogate the bank's interest in milk proceeds. In exercising its discretion, the Court noted that the debtors continued to invest time, labor, and money in their operation, the bank was oversecured and was to receive periodic cash payments as well as replacement liens in livestock, and the bank was free to make a

claim for an administrative expense under § 507(b) or to bring a subsequent motion for adequate protection. The *Lawrence* court further stated:

> ... this Court is conscientious in interpreting the Code in a manner consistent with the "fresh start" and "rehabilitative" themes of bankruptcy law. The Code was not designed with farmer bankruptcies in mind. There are many special problems inherent in a farmer bankruptcy case. Aside from the constant fluctuations in prices of farm products, the seasonal nature of grain farming and required cash flow and financing problems require special consideration. To provide a debtor with a source of cash which is unencumbered and can be used to revitalize a business (is) part of a "fresh start" and clearly facilitates rehabilitation. 41 B.R. at 38.

■ In this case, the debtors contend that the equities are in their favor, and that the PCA's security interest in its post-petition milk proceeds should be abrogated in light of the PCA's pre-petition conduct. Specifically, the debtors contend that the PCA's insistence in increasing its milk assignment, despite its knowledge that the debtors had no money to purchase feed, caused the cows to stop producing milk, thereby forcing the debtors into bankruptcy. The debtors note that only through their post-filing efforts have the cows become productive. The debtors further contend that because PCA was interested in selling the cows for beef at the time of filing, they gave up any interest in the debtors' livestock as milk cows.

The debtors' contentions are persuasive, and the Court must conclude that PCA's interest in milk proceeds should be abrogated. At the time of filing, the PCA appraised the cows as beef cattle, and was unwilling to lower its milk assignments and to assist the debtors in rehabilitating the herd. Therefore, an examination of the expenditure of time, labor and funds relative to increasing the productivity of the herd works in favor of the debtors and against the PCA's security interest in proceeds. *In re Lawrence, supra.* The Court must conclude that to allow the PCA a security interest in the proceeds would be extremely inequitable, and would give to PCA a security interest in property that arose post-petition when in fact PCA had advanced no value for that purpose. Further, the Court is influenced by the fact that PCA has other sources of collateral, and by the rehabilitative spirit of the code. *In re Lawrence, supra.*

Therefore, the Court affirms PCA's security interest in the livestock and their proceeds as of the time of filing. The Court must, however, abrogate PCA's security interest in the post-petition proceeds, including milk and crops now in the ground.

### B. Adequate Protection Of The Creditors' Interest

#### 1. FLB's Interest

■ The Court has determined that the FLB was fully secured as of the date of filing. Adequate protection for the use of the real property must include, at a minimum, the payment of property taxes to enable the FLB to avoid a superior tax lien on the property. In addition, adequate protection must include insurance on the improvements to the property. More difficult is the FLB's claim that it is entitled to the fair market value of its collateral.

The Court of Appeals for the Ninth Circuit was the first to address the issue in *In re American Mariner Industries, Inc., supra.* The precise issue before the Court in *American Mariner* was whether an undersecured creditor whose foreclosure is stayed by a bankruptcy petition is entitled, under the concept of "adequate protection," to compensation for the delay in enforcing its rights against the collateral. In *American Mariner* the creditor, Crocker National Bank, contended that because 11 U.S.C. § 361(3) requires such "adequate protection" as will provide the secured creditor with the "indubitable equivalent" of its interest in the collateral, it was entitled to monthly payments as compensation for what it might have earned on the reinvestment of its liquidated interest in the collateral. 734 F.2d at 428.

The *American Mariner* court defined the issue as whether the statutory requirement of "adequate protection" relates solely to the value of the collateral such that interest is not payable, or whether it relates to the secured creditor's interest in the collateral. If the latter, the court stated that interest is payable because an interest in the collateral includes the right after default to take possession of the collateral, sell it, and, when the creditor is a bank, use the proceeds to make another loan. Examining the statutory language and the legislative history, the *American Mariner* court concluded that because a secured creditor is entitled to the benefit of its bargain, it is entitled to be compensated for the use of its money when it is precluded by the automatic stay from liquidating its debt. 734 F.2d at 430–32. The court concluded that to hold otherwise would afford a windfall to a debtor in bankruptcy who benefits from the creditor's money. 734 F.2d at 435.

*American Mariner* was followed by the Court of Appeals for the Fourth Circuit in *Grundy National Bank v. Tandem Mining Corporation*, 754 F.2d 1436 (4th Cir. 1985).

The Court recognizes that there is a split in authority among the lower courts as to whether a secured creditor should be compensated for the fair market value of its interest in the collateral. *In re W.S. Sheppley & Company, supra*. The fact that the only two appellate courts to consider this issue have held in favor of the creditor is, however, weighty authority in support of the creditors' contentions. *See also In re Mary Harpley Builder, Inc.*, 44 B.R. 151, 155 (Bkrptcy.N.D.Ohio 1984).

Therefore, the Court must conclude that the FLB's position has merit. Because the FLB's interest is not just in the collateral as of the date of filing, but in its right to take possession of the collateral, sell it, and use the proceeds to make another loan and thereby earn interest, the Court must conclude that the debtors should make interest payments at the market rate to the FLB on a monthly basis. The market rate should be applied to the $117,000 value assigned to the property.

The Court recognizes that the cost to the debtors of making these interest payments will be substantial. Therefore, and in light of the debtors' current planting needs, the debtors should be given some "breathing space". Further, the parties should try to agree as to the applicable market rate of interest. In determining adequate protection for the FLB's interest, the parties should also keep in mind that the value of the debtors' property is declining slightly.

### 2. PCA's Interest

■ a. In *Dahlquist v. First National Bank, supra*, the debtors sought the right to use cash collateral for personal and farming expenses, and First National Bank sought to have the automatic stay lifted. Affirming the bankruptcy court's order for the use of cash collateral, the district court in *Dahlquist* held:

> Where cattle are being fed and crops are being irrigated and cared for, and both are subject to security interests, it is in the interests of all parties to continue doing so until the cattle are marketable and the crops harvested, and the use of cash collateral for such purposes is clearly necessary. *Id.* [In re Stein, 19 B.R. 458] at 460; *see SunBank/Suncoast v. Earth Lite, Inc. (In re Earth Lite, Inc.)*, 9 B.R. 440, 443 (Bankr.D.Fla.1981) (use of cash collateral vital to Chapter 11 debtor.) 40 B.R. at 971.

In *In re Stein, supra*, the debtors, dairy farmers, sought to use cash collateral to meet the operational expenses of farming. The Farmers Home Administration (FmHA), which held liens on the debtors' equipment and livestock and was the assignee of a milk contract between the debtor and its purchaser, claimed that it was not adequately protected. In approving the application for use of cash collateral, the *Stein* court noted that the FmHA was undersecured, and that as the herd continued to reproduce and the crops were harvested, the value of the livestock and crops securing the FmHA's lien increased at a faster rate than the value of the equipment depreciated. Observing that a court is not obligated to protect a creditor better than

the creditor did itself when making the loan and obtaining security, the *Stein* court concluded:

> The continued lien on the Stein's crops, livestock and equipment results in an increase rather than a decrease in collateral. In balancing harm to FmHA against the Stein's need for cash collateral in order to operate, we are persuaded by the above facts and the Code's policy favoring rehabilitation that the cash proceeds of the milk assignment should be made available to the debtor. 19 B.R. at 460.

In *Irving A. Horns Farms, Inc., supra,* the stay was lifted because the debtor, a farmer, had not provided any offer of adequate protection in the real estate. The court noted that the extent to which the creditor was undersecured increased over time because of the debt servicing requirement. The court also noted that as of the filing date in May of 1984, the debtor had not planted his 1984 crops.

In *In re Aled Corporation, supra,* the plaintiff sought relief from the automatic stay to institute foreclosure proceedings. Concluding that the debtor had no equity in the property, the court held:

> In that the debtor's defense to stay relief under 11 U.S.C. § 362(d)(1) is premised upon the existence of an equity cushion as adequate protection of the plaintiff's interest in the property we conclude that the plaintiff is entitled to relief from the stay pursuant to 11 U.S.C. § 362(d)(1). 47 B.R. at 258.

In *In matter of Dias, supra,* the court determined that there was no adequate protection where the debtor, a farmer, could only continue to operate with an extension of his loans, and where he could not repay his loans to the FmHA and the PCA even if allowed to use milk proceeds.

b. In this case, the Court has determined that the PCA met its burden as to the value of the livestock at the time of filing. The PCA appraised the worth of the cattle at approximately $10,000. Pat Koester testified that the cows were appraised at approximately $300 per cow at beef prices.

The debtors presented evidence and testimony to demonstrate that the cows have increased in value since the time of filing because they are producing enough milk to sell and because the size of the herd is increasing. As of the time of the hearing, the debtors had received three milk checks since the time of filing. The debtors also indicated that they expect milk production to continue to rise as the cows are given better feed and as they are freshened. In light of this testimony as to the value of the collateral, and the debtors' contentions that their equipment is depreciating more slowly than the livestock is appreciating, the Court must conclude that as long as the cows are fed and maintained in number and replaced as necessary, and as long as there is no substantial abuse and the cows are adequately insured, the PCA's interest in the livestock is adequately protected. *Dahlquist v. First National Bank, supra; In re Stein, supra.*

Several of the cases cited by the PCA in support of its contention that there is no adequate protection are distinguishable. In this case, the debtors have offered a detailed plan to the Court concerning the adequate protection of creditors. In *In re Irving A. Horns Farms, Inc., supra,* no such plan was offered. Further, unlike the situation in this case, the debtor in *Horns Farms* was unable to plant the yearly crops. Similarily, in *In re Aled Corporation, supra,* the debtor offered no plan of adequate protection other than a misplaced reliance that there was equity in the property. Finally, this case is distinguishable from *In matter of Dias, supra,* in that the Ramp analysis has a reasonable basis in fact and indicates that if minimum industry standards are followed, the debtors' financial position will become more favorable and they will be able to repay their loans.

As stated in the Court's bench opinion, it is the intent of the Court that the parties negotiate the precise terms of the adequate protection order. The Court will, however, allow the PCA a replacement lien in cows that existed at the time the petition was filed and that were subsequently replaced by culling. Such replacement is foreseea-

ble, and falls within 11 U.S.C. § 361(2). Therefore, the PCA has a senior security interest in replacement cattle only to the extent that its overall interest in the livestock does not exceed their appraised value as beef cattle on the date of filing.

Accordingly, the Court concludes that the creditors' interest in the debtors' property as of the date of the filing of the petition can be adequately protected. Thus, the debtors' motion to use cash collateral is granted, and the creditors' motion to lift the stay due to lack of adequate protection is denied.

### C. *Effective Reorganization*

As noted, the creditors also seek to have the stay lifted under § 362(d)(2), contending that the debtors have no equity in the property and that the property is not necessary for an effective reorganization.

It is reasonably clear from the Court's discussion of valuation that the debtors have no equity in their real property. The Court has determined that the value of the debtors' obligation to the FLB is equal to the value of the FLB's collateral at the time of filing. Further, the debtors' obligation to the PCA, $78,119.25, far exceeds the value of the cows and machinery. Thus, the only issue is whether the property is necessary for an effective reorganization.

 This is the most difficult issue because it requires the Court to speculate about the future; the parties agree that this concept implies a reasonable likelihood of a successful reorganization. The debtor has the burden of proof on this issue pursuant to 11 U.S.C. § 362(g). *Matter of Hollie, supra; Grundy National Bank v. Tandem Mining Corp., supra.*

With regard to this burden, the Court in *In re Clark Technical Associates, Ltd., supra,* stated that it is not enough for a debtor to argue that the automatic stay should continue because it needs the secured property in order to propose a reorganization. The court went on to state that if this were the test, all property held by debtors could be regarded as necessary for the debtor's reorganization. According to the court:

The key word under Code § 362(d)(2)(B) is "effective"; the property must be necessary to an effective reorganization. If all the debtor can offer at this time is high hopes without any financial prospects on the horizon to warrant a conclusion that a reorganization in the near future is likely, it cannot be said that the property is necessary to an "effective" reorganization. *In re Terra Mar Associates,* 3 B.R. 462 (Bkrtcy.B.C.Conn.1980); *In re Riviera Inn of Wallingford, Inc.,* 7 B.R. 725, C.C.H. ¶ 67,726 (Bkrtcy.B.C. Conn.1980); *In re Hutton-Johnson Co. Inc.,* 6 B.R. 855 (Bkrtcy.S.D.N.Y.1980). 9 B.R. at 740.

In *Matter of Hollie, supra,* the FmHA filed a motion for modification of the automatic stay to permit them to foreclose on real estate, farm equipment, crops and livestock and to have the debtor endorse a check made payable to him under a federal program designed to reduce milk production.

Addressing the issue of "effective reorganization," the *Hollie* court stated that in the early stages of a bankruptcy case, a court should balance the interests of the secured creditor against the congressional policy favoring reorganization, and should be hesitant to find no reasonable possibility of reorganization. The court noted that this is especially so where the debtor has not had sufficient time to formulate a plan. 42 B.R. at 118. On the facts before it, the *Hollie* court found a reasonable chance that the debtors could reorganize. The court observed:

Debtors have abandoned the row crop and feeder pig operations, which have been the major causes of Debtors' losses. Debtors note that their dairy herd is increasing in numbers, and that they expect milk sales to increase. Debtors estimate that they will be able to realize a net profit of $5,300.00 after payments to creditors. The Court does not believe that Debtors are such poor managers that a successful reorganization would be impossible. 42 B.R. at 118.

On the other hand, in *In re Beattie, supra,* the court concluded that the property was not necessary for reorganization of the debtors' dairy farm because the prospects for reorganization were not feasible. The *Beattie* case was decided in May of 1983. In determining that reorganization was not possible, the *Beattie* court observed that the debtors had been "laboring under the adversity and difficulties associated with a Chapter 11 bankruptcy since March 12, 1982," and that despite the unlimited use of milk proceeds since September 21, 1982, the debtors were unable to increase the productivity of their dairy herd. The court noted, in fact, that the milk base had fallen substantially. The court also concluded that the farm was not run in an efficient manner, and that there was some question of disease and sanitation problems. The court also observed that the debtor's operations were in financial reversal, and that the substantial outside funding needed for an effective reorganization was not available from any source. The court concluded that the government was undersecured and that "the debtors are in serious default, which default continues and grows with passing time, without hope of a turnaround." 31 B.R. at 713.

In this case, the creditors contend that the debtors' failure to show a profit in seven years is strong evidence that an effective reorganization is not possible. On the other hand, the debtors contend that 1984 was an aberration, and that their farming problems were caused by the severe drought.

The Court must conclude in this instance that the debtors' financial crisis is the result of many factors, including the 1984 drought. In addition, from the evidence before it, the Court concludes that the debtors have made only half-hearted efforts to improve their farm management skills.

The Court has studied the Ramp projections in detail. The Court finds that there is a reasonable basis in fact for these projections, and that if the debtors follow the industry standards on which they are based, there is "hope of a turnaround." *In re Beattie, supra.*

Therefore, in resolving the issue of whether the property is necessary for an effective reorganization, the Court is required to make a judgment about the debtors' willingness, ability, and commitment to operate their farm effectively and pursuant to the standards of the farming industry.

In making this judgment, the Court notes that since the filing of the petition in bankruptcy when the milk proceeds became available to them, the debtors have increased the productivity of their herd. *Cf. In re Beattie, supra.* In fact, the Vanases testified that the herd is increasing in number, and that milk production is expected to continue to increase. *In matter of Hollie, supra.* Further, even when no milk proceeds were available to the debtors for some time period, there is no indication that the livestock suffered from severe disease or problems of sanitation. *Cf. In re Beattie, supra.*

The Court has further concluded from the debtors' testimony that they are sincere and credible in their desire to achieve a successful farming operation. There does linger in the Court's mind, however, a question as to whether the debtors are willing to abide by the sound farming advice which the evidence has indicated is available to them. Therefore, the Court's determination that the property is necessary to an effective reorganization is conditioned on the debtors' getting business help and abiding by the advice they are given. While the parties should negotiate the precise terms of the order, the debtors' compliance with such business advice will be monitored by the Court.

## IV. *Conclusion*

The Court has concluded that the interests of the FLB and the PCA in the debtors' property are adequately protected. Therefore, the debtors' motion to use cash collateral pursuant to § 363(c) is granted. The parties are instructed to submit an order following the guidelines established by the Court.

Because the Court has concluded that there is adequate protection and that the property is necessary to an effective reorganization, the motions of the FLB and the PCA to lift the automatic stay pursuant to § 362(d) are hereby denied.